**The CITY OF NEW YORK, Plaintiff,**

v.

**EXXON CORPORATION, et al., Defendants.**

**No. 85 Civ. 1939 (KC).**

United States District Court, S.D. New York.

Aug. 6, 1990.

Victor A. Kovner, Corp. Counsel of the City of New York (Christopher A. Amato & Peter H. Lehner, of counsel), New York City, for plaintiff.

Lawrence A. Salibra, II, Alcan Aluminum Corp., Cleveland, Ohio, for Alcan Aluminum Corp.

Joseph DiBenedetto, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This is an action brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* (West 1983 & Supp.1990), enacted by Congress in 1980 "as a legislative response to the growing problem of toxic industrial wastes, many of which, having been disposed of before their toxicity was widely known, had contaminated the land and water resources of American towns and cities." *City of New York v. Exxon Corp. (Exxon I),* 633 F.Supp. 609, 613 (S.D.N.Y.1986) (Weinfeld, J.). Currently pending before the Court are cross-motions for summary judgment by plaintiff the City of New York ("the City") and defendant Alcan Aluminum Corporation ("Alcan").[1] For the reasons set forth below, the City's motion for partial summary judgment is granted in part, and decision is reserved on the remaining issues presented in the papers.

## FACTUAL BACKGROUND

The City commenced this action in March of 1985, under CERCLA, together with various state law claims, against fifteen corporate defendants, seeking to recover from defendants the cost of responding to a grave threat to public health and the environment caused by the illegal disposal of defendants' industrial and chemical wastes at five City landfills.[2] The wastes were transported to the landfills by certain waste-hauling companies owned or operated by Russell Mahler ("the Mahler companies"). Mahler gained access to the City landfills for the purpose of dumping the waste by bribing an employee of the City's Department of Sanitation. The complaint seeks (i) recovery of the costs incurred to date for evaluating the nature and extent of chemical contamination at the five sites and for emergency measures taken to control the off-site migration of hazardous substances; (ii) a declaratory judgment that defendants are liable for the future

---

**1.** Alcan and Refinemet International, Incorporated ("Refinemet"), are the only remaining defendants in this action. This Court recently granted partial summary judgment in favor of the City against Refinemet. *City of New York v. Exxon Corp. (Exxon III),* 112 B.R. 540 (S.D.N.Y. 1990). Refinemet's appeal of our Order is currently pending before the Court of Appeals for the Second Circuit.

**2.** The sites that are the subject of this action are the Pennsylvania Avenue and Fountain Avenue landfills in Brooklyn; Edgemere landfill in Queens; Pelham Bay landfill in the Bronx; and Brookfield landfill in Staten Island.

costs of investigations and remedial actions at the sites; and (iii) damages for injury to natural resources caused by defendants' wastes.

From 1970 through 1980, Alcan owned and operated a facility located in Oswego, New York ("the Oswego facility") where various aluminum sheet and plate products were manufactured. Part of the manufacturing process at the Oswego facility included the hot rolling of aluminum ingots, during which an oil/water emulsion was used to cool and lubricate the rolls. According to Alcan, the oil in the emulsion averaged roughly 5%, and, after circulation through the rolls, concededly contained lead, cadmium, and chromium ions, see Defendant Alcan Aluminum Corporation's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Defendant's Cross Motion for Summary Judgment Against Plaintiff ("Def. Mem.") at 1, all of which, the City contends, are listed as "hazardous substances" in regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602, see 40 C.F.R. Table 302.4.[3] The emulsion was circulated through the rolls until the oil/water suspension broke down, at which time the used emulsion was removed from the manufacturing process and a new emulsion was substituted.

After circulation, the used emulsion was pumped to a waste oil storage tank. From March 1975 through March 1980,[4] Alcan contracted with three of the Mahler companies for the removal, transportation and disposal of 3.9 million gallons of the waste oil/water emulsion. Affidavit of Russell W. Mahler, sworn to on April 24, 1989 ("Mahler Aff."), ¶ 5. According to Kenneth W. Mansfield, a former Mahler company driver, dispatcher and plant supervisor in charge of assigning trucks and drivers to various pick-up and disposal points, Affidavit of Kenneth W. Mansfield, sworn to on February 6, 1989 ("Mansfield Aff."), ¶ 5, the Mahler companies trucked the waste emulsion from the Oswego facility either directly or via a Mahler company facility located in Syracuse, New York, to a Mahler Company facility located at 37–80 Review Avenue, Long Island City, New York ("the Review Avenue facility"), id. ¶ 14, or to another Mahler Company facility located at One River Road, Edgewater, New Jersey ("the Edgewater facility"). Affidavit of Kenneth W. Mansfield, sworn to February 6, 1988 ("Mansfield 1988 Aff."), ¶ 14.

At the Review Avenue and Edgewater facilities, the waste oils from Alcan's Oswego facility, as well as oily wastes from other generators, were tested for bottom sediment and water ("BS & W") content. Mansfield Aff. ¶ 8. A high BS & W value indicated a low proportion of recoverable oil in the load, and vice versa. As a general rule, loads with a BS & W value of 50% or less were put into the oil recovery process, and loads with a BS & W value of 50% or higher were not. Id. Loads of oily waste that were not put into the oil recovery process because of high BS & W values were routinely disposed of in the City landfills. Id.; Mahler Aff. ¶ 3. According to Mahler, the principal officer of the Mahler companies, and Mansfield, the used emulsion generated by Alcan had a consistently high BS & W value, and was therefore unsuitable for processing. Mahler Aff. ¶ 6; Mansfield Aff. ¶¶ 15–16. Consequently, most of the Alcan waste was disposed of in City landfills and other locations. Id. According to Mansfield, who makes reference in his affidavit to his logbook, from 1978 to 1980, approximately 30 truckloads—or approximately 200,000 gallons—of Alcan's waste were disposed of in City landfills. Mansfield Aff. ¶ 15.

---

3. As discussed below, see infra at 486–489, Alcan disputes the City's interpretation of the listing of hazardous substances in Table 302.4, and therefore argues that the cadmium, chromium and lead found in its waste emulsion were not "hazardous substances" for purposes of CERCLA.

4. Alcan "disputes dates …: January 10, 1987, to March 20, 1980. . . ." Defendant's Statement Pursuant to Local Civil Rule 3(g) in Response to Plaintiff's Motion for Partial Summary Judgment ("Def. 3(g) Stmt. in Response"), ¶ 9. Because Alcan makes no reference to any supporting documents or affidavits, we reject this conclusory statement.

Questioning the credibility of Mahler, a convicted felon,[5] Alcan asserts that none of Alcan's wastes were disposed of in City landfills. In support, Alcan offers a letter it received in May 1979 from Russell Mahler, which reads:

> Please be informed that the liquid waste we remove from your plant is trucked to our plant in Syracuse, N.Y.
>
> It is preprocessed in Syracuse, N.Y. and then transported to Edgewater Terminals Inc., Edgewater, N.J. for final processing.
>
> This involves removal of the solids, water, and oil into their proper categories, by a process of centrifuging and other steps.

Letter, dated May 9, 1979, from Russell W. Mahler to Larry Carroll (attached as Exhibit L to Notice of Cross Motion for Summary Judgment by Defendant Alcan Aluminum Corporation ("Notice of Cross Motion")). This letter does not deny that Alcan's wastes were disposed of in City landfills.

Alcan also offers the affidavit of Walter Holst, a former Mahler company plant superintendent, who avers that all the Alcan's emulsion was processed in Syracuse, re-refined, and resold to other companies. Affidavit of Walter Holst, sworn to on December 19, 1988 ("Holst Aff.") (attached as Exhibit M to Notice of Cross Motion), ¶¶ 9, 10. Thus, according to Holst, "at no time was any Alcan waste transported [from the Syracuse facility] to the Edgewater, New Jersey hazardous waste disposal site." Id. ¶ 8. In a subsequent declaration obtained by the City, however, Holst admits that he has "no direct personal knowledge of the final destination of every truck which was dispatched to Alcan's Oswego facility for waste pick-ups." Declaration of Walter Holst, executed on August 13, 1989 ("Holst Decl.") (attached as Exhibit A to Supplemental Affidavit of Christopher A. Amato, sworn to on September 14, 1989 ("Amato Supp. Aff.")), ¶¶ 3, 5. The affidavits of Mahler and Mansfield, in contrast, are based on direct personal knowledge, and thus stand unrefuted, except for the conclusory challenge to Mahler's credibility.

To complete the chain of evidence linking Alcan's waste to the City landfills, the City offers the testimony of Phillip J. Gleason, the City's Director of Landfill Engineering. Gleason testifies that preliminary site investigations at each of the five landfills have revealed that hazardous substances of the type generated by Alcan and disposed of in the City landfills by the Mahler companies are present in the groundwater at each of the five sites, and in the oil leachate at the Pennsylvania Avenue landfill. Affidavit of Phillip J. Gleason, sworn to on March 9, 1989 ("Gleason Aff."), ¶ 9, Exhibits C and D. Moreover, groundwater containing some or all of these substances is migrating from the landfills into nearby surface waters at each of the sites; oil leachate containing some or all of these substances is being discharged into Jamaica Bay from the Pennsylvania Avenue landfill; and there is a threat of substantial future releases of hazardous substances from these sites. Id. ¶¶ 5–8. To date, the City has expended more than $2 million in responding to the release of toxic wastes at these sites, and it is anticipated that substantial additional expenditures will need to be made to remediate fully the environmental contamination at these sites. Id. ¶¶ 3–4, 10.

## PROCEDURAL HISTORY

Although the procedural history of this case is lengthy, that part relevant to defen-

---

5. On October 11, 1984, Mahler pleaded guilty to a criminal information in the United States District Court for the Southern District of New York. *United States v. Mahler*, 82 Cr. 0776 (VLB) (1984). The information charged that from 1972 to 1979, Mahler conspired to bribe John Cassiliano, an employee of the New York City Department of Sanitation, in order to obtain access to five New York City landfills for the purpose of illegally dumping chemical wastes, toxic wastes, chemically contaminated wastewaters and chemically contaminated waste oils. Mahler was sentenced to six months in federal prison, which he has served, and placed on probation for five years. The conditions of his probation require him to make restitution of over $500,000 to the City of New York and to cooperate with federal, state and city authorities regarding the illegal dumping of industrial and chemical wastes. Mahler Aff. ¶ 1.

dant Alcan can be briefly summarized. In May of 1985, Alcan moved to dismiss the complaint as against it on the ground that the cadmium, chromium, and lead in its waste were present only in "trace quantities," and that the lead constituent in its waste was not any lead compound listed as a hazardous substance in the EPA regulations. *Exxon I*, 633 F.Supp. at 619–20. The City opposed Alcan's motion on the ground that the quantity or concentration of a particular contaminant in a generator's waste is irrelevant to a determination as to whether that waste is a hazardous substance for purposes of CERCLA. The City further argued that it was irrelevant which particular compounds of cadmium, chromium and lead were present in the Alcan waste, since EPA regulations list all compounds of those elements as hazardous substances. *Id.* Without reaching the legal issue of what constitutes a hazardous substance under CERCLA, the late Judge Edward Weinfeld denied the motion in a decision dated April 24, 1986, which also decided motions to dismiss, on various grounds, by other defendants. *Id.* at 620.

Most of the defendants, but not Alcan, then filed three third-party complaints impleading approximately 300 third-party defendants. By order dated January 23, 1987, Judge Weinfeld severed and stayed the third-party actions pending completion of the main action.

On November 23, 1988, this Court approved a Judgment on Consent settling the City's claims against seven of the defendants in this action.[6] *City of New York v. Exxon Corp. (Exxon II)*, 697 F.Supp. 677 (S.D.N.Y.1988). Subsequently, on May 22, 1989, the Court approved two more Judgments on Consent settling the City's claims against an additional six defendants.[7] Since the November 23 and May 22 Judg-

ments eliminate from this action all thirteen defendants that filed third-party complaints and the Judgments explicitly provide for dismissal of the third-party claims, the only remaining defendants in this action, as explained earlier, see footnote 1, *supra*, are Refinemet and Alcan.

The City now moves for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, against Alcan as to liability, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), on the ground that (i) Alcan generated a waste oil emulsion at its Oswego facility and arranged for the Mahler companies to transport and dispose of its waste; (ii) the waste oil emulsion contained hazardous substances, as defined under CERCLA; (iii) the Mahler companies disposed of Alcan's waste, along with wastes generated by other companies, in the City landfills; (iv) hazardous substances of the type generated by Alcan and disposed of in the City landfills by the Mahler companies have been detected at the City landfills and are being released, and pose a threat of further release, at these sites; and (v) the City has incurred, and will continue to incur, response costs at these sites. Specifically, then, the City seeks an order adjudging Alcan strictly, jointly and severally liable for the response costs incurred by the City to date at the five landfills, totalling $2,404,407, as well as all future response costs at these sites, and for damages for injury to, destruction and loss of natural resources.

Alcan opposes the City's motion on two main grounds. First, Alcan asserts that a genuine issue of fact exists as to whether its waste oil emulsion was ever delivered to Mahler's Review Avenue and Edgewater facilities for reprocessing, which in turn

6. The seven defendants participating in the November 23, 1988 settlement were American National Can Corporation, BASF Corporation, Borg–Warner Corporation, Dana Corporation, Ford Motor Corporation, Koppers Company, Inc. and Public Service & Gas Company. Although the Court's decision approving the November 23 settlement was appealed by defendant Exxon Corporation and by third-party defendant Clairol, Inc., those appeals were with-

drawn prior to being heard by the Court of Appeals.

7. One of the May 22 Judgments settled the City's claims against defendants Carrier Corporation, Chrysler Corporation, Ingersoll–Rand Company and United Technologies Corporation, while the other settled the City's claims against defendants Exxon Corporation and Exxon Research and Engineering Company, Inc.

raises an issue as to whether the waste oil emulsion was actually disposed of in the City landfills. Second, Alcan raises a two-pronged question of law as to whether, assuming that its waste did actually wind-up in the City landfills, Alcan's waste is "hazardous" within the meaning of CERCLA. Alcan asserts (i) that both under CERCLA"s statutory definition of hazardous substances and under "common sense" principles of statutory construction, CERCLA does not contemplate classifying either low concentrations or inert forms of otherwise hazardous substances as hazardous, and (ii) that Alcan's waste oil emulsion falls within CERCLA's oil exclusion.

In addition, Alcan cross-moves for summary judgment, on the ground that "the Alcan waste emulsion involved in this action did not contain concentrations of [cadmium], chromium or lead which exceeded .9 ppm, and that the compounds associated with these ions cannot be identified." Defendant Alcan Aluminum Corporation's Statement Pursuant to Local Rule 3(g) on Cross–Motion for Summary Judgment ("Def. 3(g) Stmt. in Support"), ¶ 1. Alcan thus seeks summary judgment in its favor, based on the allegedly established facts concerning the concentration and form of the three substances present in Alcan's waste, and on the necessarily antecedent legal questions of whether CERCLA requires that substances, to be hazardous, must be present at waste disposal sites in a particular concentration or form. Def. Mem. at 6 (summary judgment sought on the "fact" that trace elements did not exceed .9 ppm "and were not hazardous under CERCLA").

8. CERCLA defines response actions to include "removal" and "remedial" actions. 42 U.S.C. §§ 9601(23), (24). The distinction, as explained by the late Judge Weinfeld, is that "'removal' actions are primarily those intended for the short-term abatement of toxic waste hazards, while 'remedial' actions are typically those intended to restore long-term environmental quality." *Exxon I,* 633 F.Supp. at 614.

9. Alcan does not dispute that the City landfills qualify as "facilities" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9); that contaminated groundwater at these sites is presently being "released" within the meaning of Sections

## DISCUSSION

■ Section 107(a) of CERCLA imposes liability for response costs [8] incurred by the government or private parties and for damages to natural resources on, *inter alia,* "generators" of hazardous wastes, defined as

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

Section 107(a)(3), 42 U.S.C. § 9607(a)(3). To hold a party liable as a generator of hazardous wastes under this Section, a plaintiff must establish that the defendant

> (1) disposed of its hazardous substances (2) at a facility which now contains hazardous substances of the sort disposed of by the generator [and] (3) [that] there is a release of that or some other type of hazardous substance (4) which causes the incurrence of response costs.

*United States v. Wade,* 577 F.Supp. 1326, 1333 (E.D.Pa.1983). *See also Violet v. Picillo,* 648 F.Supp. 1283, 1289–90 (D.R.I. 1986) (citing, *inter alia, Wade* ); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 235 (W.D.Mo.1985) (quoting *Wade* ). Of these four elements, only the first and second are contested.[9] As outlined earlier, Alcan argues that a genuine issue of fact exists as to whether its wastes were disposed of in City landfills,[10] and in

101(22) and 107(a), 42 U.S.C. §§ 9601(22) and 9607(a); and that the City has to date incurred expenses in connection with "removal" actions under Section 101(23), (25) and 107(a), 42 U.S.C. §§ 9601(23), (25) and 9607(a).

10. We note that the City need not "fingerprint" the wastes, that is, prove that the hazardous substances contained in the City landfills are Alcan's. "The only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site." *United States v. Wade,* 577 F.Supp. at 1333.

any event, that its wastes are not hazardous substances within the meaning of CERCLA.

Turning first to the factual question of whether Alcan's wastes were actually disposed of in City landfills, we note that summary judgment may be granted only when the moving party can establish, based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The Court must first look to the substantive law of the case to determine which facts are material. Only disputes over material facts will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that no genuine dispute as to material facts exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to show that a genuine issue of fact exists. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

As explained above, see pages 477–478, *supra*, the City asserts, relying on the affidavits of Mahler and Mansfield and the exhibits attached thereto, that the waste emulsion generated by Alcan was disposed of in the City landfills by the Mahler companies. As described in the Mahler and Mansfield affidavits, Alcan's waste emulsion was trucked from Alcan's Oswego facility to Mahler's Review Avenue and Edgewater facilities. There the Alcan waste, along with oily wastes from other generators, was tested for BS & W content. Mansfield Aff. ¶ 8; Mahler Aff. ¶ 3. Loads of oily waste with low BS & W values were put into the oil recovery process, while loads with high BS & W values were disposed of in the City landfills and other locations. *Id.* Because the Alcan waste had a consistently high BS & W value, it was unsuitable for processing, and was therefore routinely disposed of in City landfills. Mansfield Aff. ¶¶ 13–16; Mahler Aff. ¶ 6. From 1978 to 1980, approximately 30 truckloads of Alcan's waste—totalling approximately 200,000 gallons—were disposed of in City landfills. Mansfield Aff. ¶ 15.

█ As we indicated earlier, see page 478, *supra*, Alcan responds that its waste was neither trucked to Mahler's Review Avenue and Edgewater facilities, nor eventually disposed of in the City landfills. The evidence Alcan offers in support of this allegation is not, however, sufficient to meet Alcan's burden of setting forth specific facts, based on personal knowledge, which create a genuine of issue of fact as to the final destination of Alcan's wastes. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160, 170–71, n. 20 (4th Cir.1988) (defendant-generators' conclusory, unsupported allegations that their waste had never been shipped to or subsequently removed from site insufficient to withstand summary judgment), *cert. denied*, — U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). First, the letter, discussed *supra* at 478, from Russell Mahler to Alcan indicates that Alcan's "liquid waste" is transported to Edgewater for "final processing." Letter, dated May 9, 1979, from Russell W. Mahler to Larry Carroll (attached as Exhibit L to Notice of Cross Motion). The letter obviously does not refute the City's allegation that Alcan's waste was eventually transported to City landfills.[11] Second, the

---

11. We further observe that the effect the letter had on Alcan's state of mind, i.e., whether or not Alcan was aware that its wastes were eventually disposed of in the City landfills, is irrele-

affidavit of Walter Holst, in which he asserts that "at no time was any Alcan waste transported to the Edgewater, New Jersey hazardous waste disposal site," is, as indicated earlier, not based on his personal knowledge. Holst Decl. ¶¶ 3, 5.

■ Alcan also suggests that the mere fact that Mahler is a convicted felon raises a question as to his credibility, which precludes a finding, based on Mahler's affidavit, that Alcan's wastes were disposed of in the City's landfills. We recognize that, where the only evidence of dumping at a particular site was the affidavit of an owner of a waste-hauler who was a convicted felon and a defendant, to the effect that he directed the dumping, such evidence was not sufficient to establish the fact of dumping on a motion for summary judgment. *Wade,* 577 F.Supp. at 1331–32. Yet, Mahler's testimony is not the only evidence linking Alcan's waste to the City landfills; it is supported by the affidavit of Kenneth Mansfield and the documents attached thereto, including Mansfield's logbook. Accordingly, we find that Alcan's wastes were deposited in the City landfills.

Turning next to the legal issue of whether Alcan disposed of wastes which contained hazardous substances, as defined by CERCLA, we note that Alcan does not dispute that the laboratory tests performed on its waste emulsion in the course of discovery establish that the waste contained, among other things, certain amounts of cadmium, chromium and lead. Alcan does, however, dispute that these "trace amounts" were of a sufficient quantity or form so as to be considered "hazardous."

"Hazardous substances" are defined under CERCLA to include:

(A) any substance designated pursuant to section 311(b)(2)(A) of [the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA")], (B)

any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [also known as the Resource Conservation and Recovery Act ("RCRA")] ..., (D) any toxic pollutant listed under section 307(a) of [the CWA], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator [of EPA] has taken action pursuant to section 7 of the Toxic Substances Control Act.

Section 101(14), 42 U.S.C. § 9601(14). Thus, CERCLA both incorporates definitions of hazardous substances from other statutes and empowers the EPA to designate "such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment...." Section 102, 42 U.S.C. § 9602.

Each of the four environmental statutes referenced in subparts (A), (C), (D), (E) and (F) of the CERCLA definition delegates to EPA the authority to designate substances as toxic or hazardous. Pursuant to those grants of authority, EPA has promulgated a list of "hazardous substances" pursuant to Section 311(b)(2)(A) of the CWA, which is codified at 40 C.F.R. Table 116.4; a list of "toxic pollutants" pursuant to Section 307(a) of the CWA, codified at 40 C.F.R. § 401.15; a list of "hazardous wastes" pursuant to Section 3001 of RCRA, which appears at 40 C.F.R. §§ 261.30–261.33; and a list of "hazardous air pollutants" pursuant to Section 112 of the Clean Air Act, which appears at 40 C.F.R. § 61.01(a).

In addition, pursuant to Section 102, the EPA has promulgated certain regulations,

---

vant, since liability under CERCLA is strict, without regard to knowledge or intent. *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042, n. 13 (2d Cir.1985). Thus, the fact that Alcan did not choose the City landfills as the ultimate disposal site for its wastes does not preclude a finding of liability. *Conservation Chemical,* 619

F.Supp. at 233–34 (CERCLA "does not require that the generator select the site in order to be liable"); *accord United States v. Ward,* 618 F.Supp. 884, 895 (E.D.N.C.1985); *Missouri v. Independent Petrochemical Corp.,* 610 F.Supp. 4, 5 (E.D.Mo.1985).

including a table entitled "List of Hazardous Substances and Reportable Quantities" ("Table 302.4"), which identify hazardous substances for purposes of CERCLA. *See* 40 C.F.R. Table 302.4 (1988). According to the regulations, "[t]he elements and compounds and hazardous wastes appearing in Table 302.4 are designated as hazardous substances under section 102(a) of [CERCLA]." 40 C.F.R. § 302.4(a). Included in the table are "cadmium and compounds," "chromium and compounds," and "lead and compounds."[12] Based on this listing, and the listings in the other referenced statutes, the City argues that the "trace amounts," as Alcan characterizes them, of cadmium, chromium and lead found in Alcan's waste are hazardous substances, regardless of their concentration or form.

Alcan responds first that the concentrations of cadmium, chromium and lead were insufficient to constitute hazardous substances under CERCLA. At the same time, Alcan asks us to find, as a matter of fact, that "the Alcan waste emulsion involved in this action did not contain concentrations of [cadmium], chromium or lead which exceeded .9 ppm." Def. 3(g) Stmt. in Support, ¶ 1. While we accept this statement as a concession that the concentrations of the chemicals were as high as .9 ppm, we cannot find, based on the evidence before us, that the concentrations did not exceed .9 ppm. Laboratory tests conducted on Alcan's wastes in 1980 showed concentrations of cadmium ranging from .08 to .26 ppm, and averaging at .19 ppm; chromium at consistently less than .1 ppm;

and lead ranging from 4.0 to 14.2 ppm, averaging at 9.2 ppm. Affidavit of Christopher A. Amato, sworn to on March 8, 1989 ("Amato Aff."), Exhibit A.[13] December 1983 test results indicated concentrations of cadmium at .05 ppm, chromium at .08 ppm, and lead at .9 ppm. *Id.*[14] Three more laboratory reports are attached to a document entitled "Characterization of Alcan: Oswego's Waste Oil (Emulsion) Disposed of by: PAS," prepared by David J. Lagoe, Supervisor of Laboratories and Environmental Management at Alcan's Oswego facility ("Lagoe Report"). Notice of Cross Motion, Exhibit A, Attachment C. These reports indicate varying levels of cadmium, ranging from less than .1 to less than .01; chromium, ranging from .4 to less than .01; and lead, ranging from less than .1 to less than .01. Faced with all these test results apparently obtained with differing testing procedures, we are obviously in no position to determine the level of contaminants in Alcan's waste.

■ Nevertheless, we are satisfied that liability under CERCLA attaches regardless of the concentration of the hazardous substances present in a defendant's waste, so long as the defendant's waste and/or the contaminants in it are "listed hazardous substances" pursuant to 40 C.F.R. § Section 302.4(a). Numerous courts have held that Section 101(14) of CERCLA "requires only that a substance be designated as hazardous or toxic under one of the referenced statutory provisions to be a hazardous substance under CERCLA." *Unit-*

12. These categories are also listed in 40 C.F.R. § 401.15, the list of toxic pollutants designated pursuant to Section 307(a)(1) of the Clean Water Act, 33 U.S.C. § 1317(a)(1), which is specifically included in the definition of hazardous substance in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14)(D) ("any toxic pollutant *listed* under section 1317(a) of Title 33") (emphasis added).

13. Although the laboratory report does not specify what testing procedure was used to obtain the results reported or the units of measure used, a reference to the 1980 laboratory test in another document, a letter from the EPA to Alcan, discussed *infra* at footnote 16, indicates that the test was for total lead content, or "atom-

ic absorption" ("AA"). Amato Aff., Exhibit E at 2.

14. The December 1983 test results are also attached to an Alcan exhibit, the Lagoe Report, see *infra* at 483–484, in which it is identified as "[r]esults of EP toxicity testing of samples of waste emulsion from ... 1983." Notice of Cross Motion, Exhibit A, Attachment C. According to Alcan, "EP toxicity" is a testing procedure which provides a measure of solubility. "If a material is not soluble, it cannot get into the ground water, migrate and be metabolized by the body." Def.Mem. at 11. The Lagoe Report concludes that the "[t]ests of these materials indicate that neither sample was considered hazardous according to EP toxicity criteria." Notice of Cross Motion, Exhibit A at 6.

*ed States v. Carolawn Co.*, 21 Env't Rep. Cas. (BNA) 2124, 2125 (D.S.C.1984); *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151, n. 6 (1st Cir.1989) (quoting *Carolawn* ), *clarified by* 901 F.2d 3 (1st Cir.1990); *Louisiana–Pacific Corp. v. Asarco, Inc.*, 735 F.Supp. 358, 361 (W.D. Wash.) (citing *Amoco Oil* ), *aff'd,* 909 F.2d 1260, 1990 WL 89735 (9th Cir. July 3, 1990); *United States v. Conservation Chemical Co.*, 619 F.Supp. at 238. As the court in *Carolawn* determined,

> [t]he definition of "hazardous substance" in CERCLA Section 101(14) simply does not distinguish hazardous substances on the basis of quantity of concentration. Instead, the provision refers only to lists, such as the list of toxic pollutants promulgated pursuant to Section 307 of the Clean Water Act, ... which are also nonspecific with respect to quantity or concentration.

*Carolawn,* 21 Env't Rep.Cas. at 2126.

■ We recognize that certain of the statutes referenced in Section 101(14) of CERCLA, in particular the CWA and the RCRA, along with Table 302.4, set forth "reportable quantities" or "effluent standards" for the substances listed. Alcan argues that, because the concentrations in its wastes were allegedly below these reportable quantities, its waste should not qualify as a hazardous substance. There is no indication in CERCLA, however, that liability does not attach to concentrations below the reportable quantities. "[P]resumably, if Congress had intended the definition of hazardous substances to be contingent upon the presence of a certain amount or concentration of a hazardous substance, it would have so provided." *Conservation Chemical,* 619 F.Supp. at 238; *see also Carolawn,* 21 Env't Rep.Cas. at 2126, n. 3; *Wade,* 577 F.Supp. at 1340–41 (declining to read RCRA's effluent standards and reportable quantities into CERCLA's definition of hazardous substance).

"CERCLA's legislative history further supports the conclusion that the listing of a substance as hazardous, not its concentration or amount, was to control in identifying hazardous substances under CERCLA." *Carolawn,* 21 Env't Rep.Cas. at 2126. According to the Senate Report,

> [S]ubstances *listed* as hazardous or toxic under certain other Federal laws are incorporated by reference and *upon the date of enactment of this bill such substances become statutorily defined as hazardous substances for purposes of this bill.* And the release of any of them or *any constituent of them* invokes the ... response provisions and any costs of removal or remedial action or any damages are subject to the liability provision of the bill

Senate Rep. No. 96–848, 96th Cong., 2d Sess. at 24–27 (July 13, 1980), U.S.Code Cong. & Admin.News 1980, 6119 (emphasis added). "Conspicuously absent from the legislative history is any suggestion that in order to be hazardous a substance must, apart from being listed, also be found in particular concentrations." *Carolawn,* 21 Env't Rep.Cas. at 2126.

Alcan responds to the weight of authority in favor of the City on this issue largely by dismissing the case authority as "naive" and the legislative history because "Congress rarely knows what it intends." Def. Mem. at 29. Alcan's criticism of the case authority stems from its "common sense" argument that Alcan should not be held liable for "trace amounts" of certain substances found in its wastes, particularly when those substances occur naturally in the environment in concentrations which are assertedly greater than the concentrations in Alcan's waste. Although we recognize that holding a company liable for disposing of certain substances in its waste in concentrations which are assertedly less than those which occur naturally exposes companies to broad liability under CERCLA, we do not believe that this result defies common sense. Indeed, Alcan's argument, that liability should not attach to low concentrations of hazardous substances, leads to the absurd result that each defendant in a multi-defendant case such as this one can avoid liability by relying on the low concentrations of hazardous substances in its waste, while the plaintiff is left with the

substantial clean-up costs associated with the defendants' accumulated wastes. Surely Congress did not intend such a result. To the contrary, Congress, which enacted CERCLA in response to well-publicized toxic waste problems, "intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1112 (D.Minn.1982). Thus, CERCLA "should not be narrowly interpreted ... to limit the liability of those responsible for cleanup costs beyond the limits expressly provided." *Id.*

Alcan's reliance on two cases is also unavailing. According to Alcan, in *United States v. Otatti & Goss, Inc.,* 630 F.Supp. 1361 (D.N.H.1985), the suit "was dismissed [against defendant Geochem] even though its waste admittedly contained trace elements of" many elements including cadmium and lead. Def.Mem. at 30. We have not been able to locate this reference in the reported case. Moreover, a subsequent ruling in the case indicates that the plaintiff conceded that it had no evidence that the admittedly hazardous substances dumped by the waste hauler were linked to Geochem. *United States v. Otatti & Goss, Inc.,* 18 Envtl.L.Rep. (Envtl.L.Inst.) 20,771 (D.N.H.1987). There is no reference to the definition of hazardous wastes under CERCLA.

Alcan also cites *"Stringfellow,* Recommendations of the Special Master at 118," without indicating when and where this report was filed, for the propositions that spent and neutralized waste which has been "neutralized" prior to shipment to a waste dump site is not hazardous, and that trivalent chromium is not hazardous. Def. Mem. at 29–30. In fact, it appears from the quoted passage that summary judgment was denied because issues of fact remained as to the nature of the wastes. This is confirmed by the reported decision, which we assume is from the same proceeding as that cited by Alcan. *United States v. Stringfellow,* 661 F.Supp. 1053, 1058 (C.D.Ca.1987). In any event, in a subsequent ruling, the court granted summary judgment against Alcan as to liability under CERCLA for the presence of, *inter alia,* chromium and copper at a hazardous waste site known as Stringfellow. *United States v. Stringfellow,* No. 83–2501, slip op. at 3, 4 (JMI) (C.D.Ca. November 14, 1989). As to copper, the court observed that "CERCLA provides that both copper and copper compounds are 'hazardous' and no further specificity is required." *Id.* at 4.[15] Although, as discussed below, see *infra* at 487–489, we are not convinced that all copper and copper compounds are hazardous for purposes of CERCLA, the *Stringfellow* court's determination that liability may attach under CERCLA regardless of the quantity or concentration of hazardous substances which are listed in Table 302.4 comports with our conclusion here.[16]

---

**15.** Alcan is appealing the court's decision to the Court of Appeals for the Ninth Circuit.

**16.** The EPA has also determined that the concentration of a toxic pollutant is not relevant to whether or not it is considered hazardous under CERCLA. In the context of an EPA Superfund proceeding regarding a site in upstate New York formerly operated by Pollution Abatement Services ("PAS"), which Alcan had hired to dispose of its waste emulsion before contracting with the Mahler companies, Alcan appealed a determination by EPA's regional office in New York that EPA considered Alcan's waste emulsion to be a hazardous substance under CERCLA. Amato Aff. ¶ 5, Exhibit D (letter, dated September 30, 1986, from Lawrence A. Salibra, II, to Dr. J. Winston Porter, Assistant Administrator for Solid Waste and Emergency Response at EPA).

EPA's Assistant Administrator for Solid Waste and Emergency Response in Washington, D.C., confirmed the determination of the regional office, that Alcan's waste emulsion contains hazardous substances for CERCLA purposes, emphasizing that "[t]his determination does not depend on the concentration of the toxic pollutant." *Id.* ¶ 6, Exhibit E (letter, dated December 24, 1986, from J. Winston Porter to Lawrence A. Salibra, II). Because the EPA's conclusion, which comports with our reading of the statute and the legislative history, is "reasonable and not in conflict with the expressed intent of Congress," it would ordinarily be entitled to "considerable deference." *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J.1989); *see also Vineland Chemical Co. v. United States Environmental Protection Agency,* 810 F.2d 402, 409 (3d Cir.1987) (quoting *United*

Alcan's second response to the City's argument that the amounts of lead, chromium, and copper present in Alcan's waste are hazardous substances for purposes of CERCLA is that, even though the exact chemical nature of the "trace amounts" of lead, cadmium and chromium cannot be determined due to the complex nature of the chemical composition, the chemical nature of the trace levels of lead, chromium and copper is such that the chemicals are insoluble and nonhazardous. Defendant's Statement Pursuant to Local Civil Rule 3(g) in Response to Plaintiff's Motion for Partial Summary Judgment ("Def. 3(g) Stmt. in Response"), ¶ 13. This argument is contradictory: if the exact chemical nature of the substances cannot be determined, we obviously cannot be sure that the chemicals are insoluble and nonhazardous. What Alcan apparently argues, however, is that liability under CERCLA does not attach to all compounds consisting in part of, for example, lead. Rather, liability attaches only to certain lead compounds which are listed in Table 302.4 and the other statutes referred to in Section 101(14). In other words, Alcan asserts that Congress could not have intended CERCLA liability to attach to all forms of lead, chromium and copper, but only to those compounds specifically identified.

Alcan's novel argument centers around a close reading of Table 302.4, which, as indicated earlier, lists "lead and compounds," "chromium and compounds," and "cadmium and compounds." Alcan contends that the EPA meant to designate only an exclusive list of compounds under these generic listings. In support of this contention, Alcan first observes that only specifically enumerated compounds, but not the generic headings, have Chemical Abstract Service Registry Numbers ("CASRN's"). There is no explicit requirement, however, that every chemical compound have a CASRN, a number which appears to be provided only for the convenience of the user. See, e.g., 40 C.F.R. § 116.4 (Chemical Abstract System (CAS) numbers added to list of hazardous substances "for convenience of the user only").

■ Alcan also attaches significance to the fact that the generic categories do not have a "reportable quantity" assigned to them. Section 102 of CERCLA, 42 U.S.C. § 9602, authorizes EPA to establish "reportable quantities" of hazardous substances, the release of which triggers the notification requirement of Section 103, 42 U.S.C. § 9603. Pursuant to that authority, Table 302.4 sets forth the reportable quantities for some, but not all, of the sub-

States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985)).

Alcan asserts, however, that we should disregard the EPA's determination because the EPA's letter "does not reflect actual EPA implemented policy." Def.Mem. at 19. In support of this argument, Alcan claims first that the proceeding involving the PAS site, United States v. Alcan Aluminum Corp., 87 Civ. 920 (N.D.N.Y.), revealed "numerous examples where the EPA deleted parties from the list of hazardous waste contributors because their waste contained trace materials, often well in excess of those in the Emulsion involved in this case." Id. For example, Alcan points to the EPA's decision not to treat Cadbury Schweppes, Inc. ("Cadbury") as a Potentially Responsible Party ("PRP") under CERCLA with respect to hazardous substances located in the Kin–Buc Landfill, a waste disposal site in Edison, New Jersey, even though tests of samples of Cadbury's wastes indicate the presence numerous substances which are listed in Table 302.4, including cadmium, chromium, and lead. As correspondence between Cadbury

and the EPA reveals, the EPA apparently did not consider the chemicals in Cadbury's wastes to be hazardous in part because they did not meet the "reportable quantities" set forth in the CWA and the RCRA (referenced in Sections 101(14)(A) and (C), respectively). See Notice of Cross Motion, Exhibit F (letter, dated November 14, 1985, from Perry Katz, Environmental Scientist at EPA, to H. Todd Stitzer, Esq., Assistant General Counsel, Cadbury Schweppes, Inc.; letter, dated January 30, 1985, from H. Todd Stitzer to Perry Katz). Thus, while it could be argued that the EPA has taken inconsistent positions with respect to Cadbury Schweppes' waste and Alcan's waste, we are in no position, and the parties here were in no position, to determine and assess the broad administrative and procedural factors of the respective inquiries that may have led EPA to take the position that it did in the matter cited. However, even though the EPA's letter to Alcan is more recent and obviously more relevant to this proceeding than its letter to Cadbury Schweppes, we will not consider the EPA's determination with respect to Alcan's waste.

stances listed. As explained by the EPA in the Final Rule:

> The generic groups of chemicals designated under [CWA] section 307(A), such as "SILVER AND COMPOUNDS," are printed in capital letters and have no RQ [reportable quantity] assigned to them. These generic groups of chemicals could potentially encompass hundreds of specific compounds with varying toxicities; it is therefore not appropriate to establish a single RQ for each generic group. Although CERCLA notification requirements apply only to specific compounds for which RQ's are listed in Table 302.4, *CERCLA liability may still attach to releases of specific compounds that are within one of the generic listings but not specifically listed in Table 302.4.*

Final Rule at p. 14, 50 Fed.Reg. 13472–3 (emphasis added). Thus, if a substance is listed by name or included in any of the generic groups listed in Table 302.4, it may be a "hazardous substance" as defined by CERCLA, and the absence of a reportable quantity is irrelevant to that determination.[17] *See Wade,* 577 F.Supp. at 1339–41.

■ Alcan further argues that the specific listing of certain chromium containing waste streams in Table 302.4 indicates that Congress did not intend all chromium-containing compounds to be hazardous substances for CERCLA purposes, since the specific listings would then be superfluous. The chromium-containing waste streams listed in Table 302.4, however, are "hazardous wastes" under Section 3001 of the RCRA, one of the five statutory underpinnings of the hazardous substance definition. Section 101(14), 42 U.S.C. § 9601(14). Thus, the listing of both chromium compounds and chromium-containing waste streams as hazardous substances simply appears to be the result of overlap between the various statutes which form the basis of CERCLA's definition of hazardous substance. These overlapping provisions in CERCLA's hazardous substance definition

are evidence that "Congress intended to cast an especially broad remedial net with CERCLA, designed to address the special concerns presented by hazardous waste dumps." *Carolawn,* 21 Env't Rep.Cas. at 2125.

■ Alcan's final argument in support of its contention that not all forms or compounds of lead, chromium and cadmium were intended to be hazardous substances under CERCLA is its assertion that, because Section 302.4(b) of the EPA's regulations, 40 C.F.R. § 302.4(b), contains specific provisions for determining whether a waste is a CERCLA hazardous substance because of its chromium, lead or cadmium content, not all compounds containing these elements can be hazardous substances. Def. Mem. at 16–17. Section 302.4(b) provides:

> *Unlisted hazardous substances.* A solid waste, as defined in 40 C.F.R. 261.2, which is not excluded from regulation as a hazardous waste under 40 C.F.R. 261.-4(b), is a hazardous substance under section 101(14) of the Act if it exhibits any of the characteristics identified in 40 C.F.R. 261.20 through 261.24.

40 C.F.R. § 302.4(b). Alcan contends that, because neither its waste oil emulsion nor the specific compounds in it are listed in Table 302.4, we must apply Section 302.4(b) to determine whether or not its waste is hazardous.

Our preliminary analysis of Section 302.-4(b) leads us to agree. Assuming that a waste in question (1) is a solid waste under 40 C.F.R. § 261.2 which (2) is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), the next question is (3) whether the waste exhibits any of the characteristics identified in 40 C.F.R. 261.-20 through 261.24. These characteristics are ignitability, corrosivity, reactivity and EP toxicity. To determine whether the waste exhibits the characteristic of EP toxicity, it must be determined whether "the extract from a representative sample of the

---

**17.** This interpretation is consistent with the inclusion in CERCLA's definition of hazardous substance of "any toxic pollutant *listed* under section 1317(a) of Title 33," 42 U.S.C. § 9601(14)(D) (emphasis added), since the list

of toxic pollutants designated pursuant to Section 307(a)(1) of the Clear Water Act, 33 U.S.C. § 1317(a)(1), includes the categories "cadmium and compounds," "chromium and compounds," and "lead and compounds." 40 C.F.R. § 401.15.

waste contains any of the contaminants listed in Table 1 at a concentration equal to or greater than the respective value given in that Table." 40 C.F.R. § 261.24(a). "Table 1," entitled "Maximum Concentration of Contaminants for Characteristic of EP Toxicity," lists, *inter alia,* cadmium, maximum concentration of 1 mg/1; chromium, 5 mg/1; and lead, 5 mg/1. Thus, applying Section 302.4(b) leads to a consideration of whether a waste exhibits EP toxicity for, among other metals, cadmium, chromium, and lead.

This reference to, for example, EP toxicity for chromium, in the EPA's provision for "unlisted hazardous substances" in Section 302.4(b) is inconsistent with the City's theory that the generic category "chromium and compounds" in Table 302.4 includes all chromium compounds, so that all chromium compounds are "listed hazardous substances" under Section 302.4(a). If "chromium and compounds" included all chromium compounds, it would never be necessary to apply Section 302.4(b) to determine whether or not a waste is EP toxic for chromium. In other words, the reference in Section 302.4(b) to Table 1 and 40 C.F.R. § 261.24 would be meaningless for any chromium-containing waste, as it would be for lead- and cadmium-containing wastes. Because we do not believe that the EPA intended to enact a meaningless regulation, we believe that not all chromium, lead, and cadmium compounds are "listed hazardous substances" under Section 302.4(a).

Moreover, as Alcan explains, EP toxicity is a test for solubility, Def.Mem. at 11, so that if a waste exhibits little or no EP toxicity for a particular contaminant, the waste contains largely insoluble forms of that contaminant. "If a material is not soluble, it cannot get into the ground water, migrate and be metabolized by the body," *id.,* that is, it does not present a health hazard. Thus, Alcan asserts, CERCLA liability should attach only to wastes which contain soluble contaminants. In other words, a waste containing a compound which falls within a generic category in Table 302.4 should give rise to liability under CERCLA only if the waste is EP toxic for that compound.

We note, however, that the City has not responded to Alcan's argument that Alcan's waste is an "unlisted hazardous substance" under Section 302.4(b), and that Alcan's own analysis of that section is sketchy at best. We further note that EPA, in its letter to Alcan, discussed *supra* at footnote 16, informed Alcan that the metals in its wastes, "regardless of form, fall within the generic groups of chemicals designated as hazardous substances under Section 101(14) of CERCLA." Amato Aff., Exhibit E at 1.[18] Indeed, since an inert form of a metal may, after being disposed of, combine with other substances to become a health hazard, it may well be that Congress intended for all forms of the metals listed in Table 302.4 to qualify as hazardous substances under CERCLA. Because the present record does not provide an adequate basis to determine how Section 302.4(b) should be interpreted or applied, further briefing is necessary on the meaning of Section 302.4(b), its interpretation by the EPA, and its application to this case.

Even if we were to apply Section 302.4(b) to Alcan's waste, our analysis would not be conclusive. First, Alcan's waste qualifies as a "solid waste," which is defined as "any discarded material," 40 C.F.R. § 261.2(a)(1), meaning that it is "abandoned," 40 C.F.R. § 261.2(a)(2)(i), that is, "disposed of." 40 C.F.R. § 261.2(b)(1). Second, Alcan's waste does not appear to be excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), unless it qualifies under 40 C.F.R. § 261.4(b)(6)(i) as a "[w]aste[ ] which fail[s] the test for the characteristic of EP toxicity because chromium is present," which does not seem to be the case, since Alcan has not "shown ... that the chromium in the waste is exclusively (or nearly exclusively) trivalent chromium," as required by 40 C.F.R. § 261.4(b)(6)(i)(A). Thus, the remaining question is whether Alcan's waste "exhibit[s] any of the characteristics identified in

**18.** As we have observed, the EPA's positions with respect to Alcan's waste and the waste of others may not have been consistent. See *supra* footnote 16.

40 C.F.R. §§ 261.20 through 261.24," 40 C.F.R. § 302.4(b), the only relevant characteristic appearing to be EP toxicity, 40 C.F.R. § 261.24.

As we indicated earlier, see *supra* at 483, we are in no position to determine the level of contaminants in Alcan's wastes. It is not clear whether the laboratory reports attached to the Lagoe Report provide EP toxicity testing results, one of which was also attached to the Affidavit of Christopher A. Amato, see *supra* footnotes 13 and 14 and accompanying text, since none of the laboratory reports specify what testing procedure or unit of measure was used. We recognize that both the Lagoe Report, see *supra* at footnote 14, and the EPA's letter to Alcan, Amato Aff., Exhibit E at 2, state that Alcan's waste is not EP toxic. The City has not, however responded to these statements. Thus, we find that further briefing is also necessary on the factual questions raised by the application of Section 302.4(b) to Alcan's waste.

█ Finally, we turn to Alcan's argument that its waste oil emulsion should be subject to the petroleum exclusion to CERCLA's definition of hazardous substance. According to Section 101(14), "[t]he term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph." 42 U.S.C. § 9601(14). Alleging that the concentrations of cadmium, chromium, and lead in its waste emulsion are less than the concentrations of those substances found in virgin oil, Alcan contends that it should be able to benefit from the exclusion for petroleum. Def.Mem. at 18.

We observe at the outset that Alcan has not established that the concentrations in Alcan's waste are less than concentrations in virgin oil. For example, Alcan quotes an EPA ruling as establishing a mean concen-

tration of 3.5 ppm of lead in "Fuel Oil No. 6." *Id.* (quoting 52 Fed.Reg. 16982 (May 6, 1987)).[19] Yet, some tests of Alcan's waste indicate concentrations of lead as high as 14.2 ppm. *See* Amato Aff., Exhibit A. Moreover, the EPA, in responding to Alcan's argument that it should benefit from the petroleum exclusion, emphasized that the "hazardous substances are present in Alcan's waste as contaminants in concentrations higher than that normally found in refined fractions of oil." Amato Aff., Exhibit E (letter, dated December ·24, 1986, from Dr. J. Winston Porter, Assistant Administrator for Solid Waste and Emergency Response at EPA, to Lawrence A. Salibra, II).

In addition, the presence of cadmium, chromium, and lead present in Alcan's waste was not the result of Alcan's use of "virgin oil," but rather of Alcan's industrial processes. In a report on the waste oil emulsion prepared by Alcan's Supervisor of Laboratories and Environmental Management, Alcan explains that

> The emulsions are prepared using deionized water. Makeup of losses due to evaporation is also accomplished using deionized water. *However, over a period of time, concentrations of some common metal do increase.*

Amato Aff., Exhibit C at 3 (emphasis added). According to the April 4, 1985 Final Rule published by the EPA, adjusting reportable quantities under Section 102 of CERCLA,

> EPA interprets the petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specifically listed or designated hazardous substance is present in such products. *However, EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.*

50 Fed.Reg. 13460 (April 4, 1985) (emphasis added). Thus,

---

**19.** As the City points out, the quoted table from the Federal Register was published in the context of a proposed rulemaking concerning the burning of hazardous waste in boilers and industrial furnaces. *See* 52 Fed.Reg. 16982 (May

6, 1987). Since Alcan does not establish that its waste contained No. 6 fuel oil, it is not clear why the comparison of Alcan's waste to No. 6 fuel oil is relevant.

hazardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum during use are *not* part of the "petroleum" and thus are not excluded from CERCLA under the exclusion.

EPA General Counsel Memorandum on "Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(2)(a)" (attached as Exhibit D to Amato Supp.Aff.) at 5–6. Because the hazardous substances present in Alcan's waste emulsion were added during the production process, we believe that the petroleum exclusion should not apply to Alcan's waste.

This conclusion is consistent with congressional intent in establishing a petroleum exclusion to the definition of hazardous substance under CERCLA. As the General Counsel summarizes in his memorandum,

> The language of the provision, its explanation in the legislative history, and the Congressional debates on the final Superfund bill clearly indicate that Congress had no intention of shielding from Superfund response and liability hazardous substances merely because they are added, intentionally or by use, to petroleum products.

*Id.* at 6. To the contrary, the primary purpose of the exclusion for petroleum, which is defined principally in terms of crude oil and crude oil fractions, was to exclude from CERCLA's coverage "spills or other releases strictly of oil," S.Rep. No. 96–848, 96th Cong., 2d Sess. 29–30 (1980), not releases of hazardous substances mixed with oil. This is confirmed by the congressional debates, which reveal that members of Congress understood CERCLA to cover contaminated oil slicks, *see* 126 Cong.Rec. at H11798 (daily ed. December 3, 1980) (Rep. Edgar); *id.* at S14963 (daily ed. November 24, 1980) (Sen. Randolph), PCB's in waste oil, *id.* at S14974 (Sen. Mitchell), dioxin in motor fuel used as a dust suppressant, *id.*, and contaminated waste oil, *id.* at S14980 (Sen. Cohen). Clearly, though Congress intended to exclude oil spills from the coverage of CERCLA, Congress did not intend to exclude waste oils such as Alcan's, which are by no means strictly

"crude oil or any fraction thereof." Accordingly, we find that Alcan's waste does not fall within CERCLA's petroleum exclusion.

## CONCLUSION

In summary, we find as a matter of fact that Alcan's wastes were disposed of in City landfills; and, as a matter of law, that "listed hazardous substances" need not be present in any particular concentration to be considered hazardous under CERCLA, and that Alcan's waste does not qualify for the petroleum exclusion to CERCLA's definition of hazardous substance. Thus, the City's motion for summary judgment is granted on these issues.

As to the question of whether Alcan's waste is an "unlisted hazardous waste" under 40 C.F.R. § 302.4(b), which does not exhibit EP toxicity for chromium, cadmium, and lead, we find that further briefing is necessary. Thus, the City is directed to submit its papers within twenty (20) days of the date of this Order, and Alcan is directed to respond twenty (20) days thereafter. The parties are expected to submit detailed memoranda and affidavits on the issues raised by our earlier discussion of the relevance, interpretation and application of Section 302.4(b). Accordingly, the Court reserves decision on the remaining issues pending submission of further papers as outlined above.

SO ORDERED.