**UNITED STATES of America and State of New York, Plaintiffs,**

v.

**ALCAN ALUMINUM CORP., et al., Defendants.**

**ALCAN ALUMINUM CORP., Third–Party Plaintiff,**

v.

**CORNELL UNIVERSITY, Third–Party Defendant.**

**No. 87–CV–920.**

United States District Court, N.D. New York.

Jan. 15, 1991.

Frederick J. Scullin, Jr., U.S. Atty. (Craig A. Benedict, of counsel), Syracuse, N.Y., and Richard B. Stewart, Asst. Atty. Gen. Land and Natural Resources Div., Environmental Enforcement Section (Michael Bardee, Henry Friedman, of counsel), Washington, D.C., for plaintiff U.S.

Robert Abrams, Atty. Gen. State of N.Y. (David A. Munro, Karen Kimball, of counsel), Albany, N.Y., for plaintiff State of N.Y.

Lawrence A. Salibra, II, Cleveland, Ohio, for defendant Alcan Aluminum Corp.

Thomas Mead Santoro, Patricia McClary, Cornell University, Office of University Counsel, Ithaca, N.Y., for third-party defendant Cornell University.

## MEMORANDUM–DECISION AND ORDER

McAVOY, District Judge.

### Introduction

By this action, the United States of America and the State of New York initially sought to recover from some 83 business entities response costs under section 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607 (as amended), in connection with the clean-up of an inactive hazardous waste site formerly owned by Pollution Abatement Services of Oswego, Inc. (PAS) and currently owned by the County of Oswego. At the time the action was commenced, those costs exceeded $12 million. Shortly after commencement, plaintiffs entered into a consent decree with 82 of the defendants recovering some $9,105,308.17; Alcan Aluminum Corp. was the lone holdout and the suit continued as against it for the difference between the stipulated amount of incurred costs ($12,-319,551.04) and the amount recovered in the partial settlement. Additional costs have been incurred since then and currently total in excess of $13 million. Discovery having been concluded, the parties' dispute (in the main action) is before the court on cross motions for summary judgment. The third-party action is also before the court on cross motions for summary judgment. For the reasons that follow, the court grants the motions of the United States and the State of New York as against Alcan Aluminum Corp. in their entirety in the main action and thereby denies Alcan's motion; insofar as the third-party action is concerned, the court grants Alcan's motion to the extent of declaring that third-party defendant Cornell University is also liable for its fair share of response costs incurred by the United States and the State of New York and accordingly denies the motion of Cornell University. A hearing is necessary to determine the amount of that fair share.

### Background

#### A. Historical

From approximately 1970 until 1977, various chemical waste materials were received for disposal or treatment at the PAS site. As a result of PAS operations, the site's surface became contaminated by hazardous substances because of wastes leaching from drums, lagoons being overtopped and surface runoff.

During the 1970 through 1977 period, Alcan, by contract, agreement or otherwise, arranged for the disposal or treatment at the PAS facility 4,607,380 gallons of an emulsion generated at its plant in Oswego, New York in conjunction with the hot rolling of aluminum ingots. (In addition to aluminum, the ingots used by Alcan contained chromium, copper, lead and zinc.) The Alcan emulsion, basically a mixture of water (primarily) and mineral oil, was circulated and recirculated through the rolls, picking up fragments of ingots containing aluminum, chromium, copper, lead and zinc in the process, until removed from the manufacturing process and sent to the PAS facility. (In addition to aluminum, chromium, copper, lead and zinc, defendant concedes that its emulsion contained cadmium.) During this period, Alcan, by contract, agreement or otherwise also arranged for the disposal at the PAS facility of 200 gallons of polychlorinated biphenyls.

In 1976 and 1977, the United States began undertaking response measures at the PAS site; in 1978, the State, in conjunction with the United States, conducted a surficial cleanup which included removing 4,000 drums from the site; in 1982, the United States and the State entered into a formal cooperative agreement to address the environmental problem posed by the PAS site. This lawsuit followed.

### B. Statutory

Through CERCLA, enacted in 1980 as a comprehensive response to the environmental threat posed by the disposal of hazardous substances, Congress has provided the federal government and the States, through cooperative agreements with the Environmental Protection Agency, with an effective means to clean up toxic waste sites around the country and with the authority to force those persons responsible for creating the hazardous conditions to bear the cost of the cleanups. *See United States v. Monsanto Co.*, 858 F.2d 160, 167 and n. 8 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986); *State of New York v. Shore Realty*, 759 F.2d 1032, 1040–1041 (2d Cir. 1985); 42 U.S.C. §§ 9604(d)(1) and 9607(a) (1983 and Supp.1990). In pertinent part, CERCLA provides as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> . . . .
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person ... at any facility ... owned or operated by another party or entity and containing such hazardous substances
>
> . . . .
>
> ... from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> (A) all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan[.]

42 U.S.C. § 9607(a)(3) (Supp.1990); *see also Shore Realty*, 759 F.2d at 1043, 1043 n. 16 (commenting on the correct construction of section 9607(a)).

As various courts have noted, liability under CERCLA, which is strict, *Shore Realty*, 759 F.2d at 1044, and joint and several unless the defendant demonstrates that the harm is divisible, *O'Neil v. Picillo*, 883 F.2d 176, 178–179 (1st Cir. 1989), *cert. denied sub nom. American Cyanamid Co. v. O'Neil*, — U.S. —, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), would be established in this "cost recovery" action if the plaintiffs prove each of the following:

1) the PAS site is a "facility" within the meaning of 42 U.S.C. § 9601(9)(B);

2) a "release", *see* 42 U.S.C. § 9601(22), or "threatened release" of hazardous substances, *see* 42 U.S.C. § 9601(14), has occurred at the PAS site;

3) the release or threatened release has caused the United States and the State of New York to incur response costs, *see* 42 U.S.C. § 9607; and

4) Alcan falls with at least one of the four classes of responsible persons described in 42 U.S.C. § 9607(a),

see *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1378–1379 (8th Cir.1989); *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989); *Shore Realty*, 759 F.2d at 1043–1045, and if Alcan fails to establish by a preponderance of the evidence one of the three narrow defenses provided by 42 U.S.C. § 9607(b), *Amoco Oil*, 889 F.2d at 668; *Shore Realty*, 759 F.2d at 1042, 1044. Liability under CERCLA in a "cost recovery" action presents an issue separate and distinct from that posed by the issue regarding which incurred response costs defendant is obligated to pay. *Amoco Oil*, 889 F.2d at 668.

*Discussion*

*A. Alcan's liability*

Much of what plaintiffs need to prove in order for liability to be imposed on Alcan is not in dispute. In its attempt to resist liability, Alcan argues essentially that the concentrations of cadmium, chromium, copper, lead and zinc in its emulsion are less than background levels and, therefore, do not constitute hazardous substances under CERCLA. Slightly more specifically, Alcan seeks to have this court read into the statutory and regulatory scheme (1) a requirement that in order for the listed substances to be deemed "hazardous" these substances must be present in a certain amount or concentration and (2) a requirement that the listed substance be present in a "harmful" form, after all, defendant argues, several of these substances and many listed by the EPA occur naturally and are even essential to the continued existence of life. Underlying defendant's position, however, is, perhaps, the more fundamental argument, related to its argument that substances must be in a specific form in order to be deemed "hazardous," that its waste oil emulsion and the substances it concedes were contained therein are not specifically listed in the 40 C.F.R. § 302.4 Table of Hazardous Substances

and, therefore, the court must apply the provisions of 40 C.F.R. § 302.4(b) pertaining to unlisted substances in order to determine whether its waste oil emulsion and the cadmium, chromium, copper, lead and zinc contained therein are "hazardous substances" under CERCLA. This is so, defendant argues, because the "generic headings" in the Table 302.4 list do not have a Chemical Abstract Service Registry Number, a Reportable Quantity or a Resource Conservation and Recovery Act number. For the reasons that follow, defendant's position is rejected as meritless; suffice it to say that the court will not rewrite the statutory and regulatory scheme to suit defendant's needs and desires. Congress and the EPA, through a congressional grant of authority, have spoken; the court's task is to apply the law in as straightforward a manner as possible, consistent with the dictates of the Constitution, so as to give full effect to the policy underlying CERCLA.

■ A "hazardous substance" is defined in CERCLA by reference to its provisions and to that of other environmental statutes. Specifically, Congress has provided that

[t]he term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or [t]he term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has

taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14) (Supp.1990); *see also id.* § 9602(a) (Supp.1990) (authorizing the Administrator to designate additional substances which, when released into the environment, may present substantial danger to the public health or welfare or the environment). Hazardous substances under CERCLA, then, include all substances so designated under other statutes pursuant to the grant of authority contained therein in addition to substances so designated by the EPA pursuant to the grant of authority under 42 U.S.C. § 9602(a). *See United States v. Monsanto Co.,* 858 F.2d at 165 n. 4. Accordingly, pursuant to the various grants of authority under other environmental laws, the EPA has promulgated a list of "hazardous substances" under section 311(b)(2)(A) of the Clean Water Act (codified at 40 C.F.R. Table 116.4 (1990)), a list of "toxic pollutants" under section 307(a) of the Clean Water Act (codified at 40 C.F.R. § 401.15 (1990)), a list of "hazardous wastes" under section 3001 of the Resource Conservation and Recovery Act (appearing at 40 C.F.R. §§ 261.30–261.33 (1990)), and a list of "hazardous air pollutants" pursuant to section 112 of the Clean Air Act (codified at 40 C.F.R. § 61.01(a) (1989)). Additionally, pertinent CERCLA regulations provide that " '[h]azardous substance' means any substance designated pursuant to 40 CFR Part 302," 40 C.F.R. § 302.3 (1989), and that "[t]he elements and compounds and hazardous wastes appearing in Table 302.4 are designated as hazardous substances under section 102(a) of the Act [i.e., 42 U.S.C. § 9602(a)]," 40 C.F.R. § 302.4 (1989). It bears noting, however, that each of the elements, compounds and hazardous wastes appear on the Table 302.4 List of Hazardous Substances by virtue of one or more of four statutory sources—to wit, sections 307(a) and 311(b)(4) of the Clean Water Act, section 112 of the Clean Air Act and section 3001 of the Resource Conservation and Recovery Act. *See* 40 C.F.R. § 302.4 note and Table 302.4 footnotes. Table 302.4, then, appears to be nothing more than a compilation of hazardous substances so designated already under the Clean Water Act, the Clean Air Act and the Resource Conservation and Recovery Act.

■ In response to defendant's argument, suffice it to say that "[t]he plain statutory language fails to impose any quantitative requirement on the term hazardous substance," *Amoco Oil,* 889 F.2d at 669, and, as noted in *Amoco Oil,* that the mere listing of an element, compound or hazardous waste establishes that a substance is hazardous as a matter of law is a holding supported by courts that have considered the definitional requirements of the term and the congressional comments contained in the legislative history, *id.* (citing *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d at 1151–1152; *Eagle–Picher Indus. v. United States,* 759 F.2d 922, 927 (D.C.Cir.1985); *City of New York v. Exxon Corporation,* 744 F.Supp. 474, 483–487 (S.D.N.Y.1990); *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143, 1147 (D.Ariz.1984)); *United States v. Carolawn Co.,* 21 Env't Rep.Cas. (BNA) 2124, 2125, 2126 (D.S.C.1984); *see also United States v. Western Processing Co., Inc.,* 734 F.Supp. 930, 936 (W.D.Wash.1990) (government need not prove that the release was above background levels; the principle that the law does not concern itself with trifles is not a defense to CERCLA liability); *United States v. Nicolet, Inc.,* 712 F.Supp. 1205, 1207 (E.D.Pa.1989) (noting that, "as long as a substance is on one or more of the lists identified at 42 U.S.C. § 9601(14), it is a hazardous substance irrespective of the volume or concentration of the substance found at the site in question"). In the court's view, there is no principled basis upon which to deviate from the foregoing rule that the mere listing of a sub-

stance by EPA renders that substance hazardous. That various listed substances are naturally found in the environment (i.e., in the normal course of events) does not stand in the way of imposing liability against a generator of that substance—the corporate generator, a non-natural person, has added to what nature has already seen fit to provide for the continued existence of various life forms on this planet; that Congress has enacted laws to limit, and perhaps limit quite severely, additions to nature for the sake of the environment and of life on this planet seems eminently reasonable. Similarly, there is simply nothing in the statute or the regulations which supports the view that a particular substance is "hazardous" only if it is in a specific chemical form, that is, in a form that makes the substance water-soluble. Also, the compound containing a listed element found in the released matter need not itself be specifically and separately listed—such compounds are hazardous substances under CERCLA by virtue of their inclusion, insofar as is pertinent here, in the specifically listed generic or broad class of elements and compounds designated under section 307(a)(1) of the Clean Water Act: "chromium and compounds," "copper and compounds," "lead and compounds," and "zinc and compounds" are expressly so included in "the list of toxic pollutants designated pursuant to section 307(a)(1) of the [Clean Water] Act," 40 C.F.R. § 401.15 (1990), thereby rendering all of these elements and their compounds "hazardous substances" under CERCLA; this list was expressly made a part of the Table 302.4 List of Hazardous Substances. That the generic or broad class of hazardous elements and compounds does not itself have a "Chemical Abstract Service Registry Number" (CASRN) is immaterial inasmuch as that number appears only for the convenience of the user. See 40 C.F.R. § 116.4. That the generic or broad class of hazardous elements and compounds was not assigned a Final RQ (Reportable Quantity), a quantity of the hazardous substance the release of which requires notification, see 40 C.F.R. §§ 302.3, 302.5 and 302.6, although it has been assigned a statutory

RQ, is also immaterial inasmuch as a substance is deemed hazardous presumably because of the unacceptable risks it poses to human health and to the environment. There is simply no requirement in the statutory or regulatory scheme that an element or compound have an RQ in order for it to be "hazardous," and, in fact, the statutory scheme reveals otherwise. The term "hazardous substance" includes any toxic pollutant listed under section 307(a) of the Clean Water Act, see 42 U.S.C. § 9601(14)(D), yet these listed toxic pollutants do not have a final RQ (nor do they have a CASRN, for that matter).

The court notes in passing its disagreement with the court in *City of New York v. Exxon Corporation* to the extent that that court appears to have held, at least preliminarily, that 40 C.F.R. § 302(b) and not section 302(a) is applicable to determining whether Alcan's waste oil emulsion or the specific compounds in it are hazardous substances under CERCLA because the waste oil emulsion and the specific compounds found therein are not squarely listed in Table 302.4. See 744 F.Supp. at 487–488. Suffice it to say, first, that Alcan has conceded that its waste oil emulsion contained cadmium, chromium, copper, lead and zinc and, second, that these elements and all their respective compounds are hazardous substances under CERCLA by virtue of their designation as toxic pollutants under the Clean Water Act which list was, as has already been noted, included, pursuant to 42 U.S.C. § 9601(14)(B) and perhaps redundantly so, in the Table 302.4 List of Hazardous Substances and Reportable Quantities; as such, the court need not ever consider the pertinence of 40 C.F.R. § 302.4(b) (and the regulations—40 C.F.R. §§ 261.2, .4(b) and .20–.24—referenced therein) and therefore it is unnecessary for the court to engage in any discussion of ignitability, corrosivity, reactivity or EP (Extract Procedures) toxicity to determine whether a substance is to be deemded "hazardous."

The court also notes its disagreement with the court in *Amoco Oil* to the extent that that court has seemingly read into the language of 42 U.S.C. § 9607(a)(4) the re-

quirement that, in order for a release of a hazardous substance to have caused (and justified) the incurrence of response costs, and hence in order for there to be liability, the release violate some applicable State or Federal standard imposing a threshold quantity or concentration requirement. *See* 889 F.2d at 669–672. In essence, that court, while recognizing that the "plain statutory language fails to impose any quantitative requirement on the term hazardous substance," *id.* at 669, has imposed such a requirement on the imposition of liability in the attempt to limit the scope thereof. Suffice it to say that such an interpretation (which the *Amoco Oil* court conceded necessitated the "ent[ry] of unexplored territory," *id.* at 670) is not warranted by the plain language of the statute and in fact appears to conflict with that language. *See United States v. Western Processing Co.*, 734 F.Supp. at 936–937 and 941–942 (concluding that *Amoco Oil* should be confined to its facts and implicitly calling that court's reasoning into doubt).

 As part of its effort to resist liability, defendant also argues that the "petroleum exception" to the term "hazardous substance" is applicable here. The pertinent CERCLA provision, 42 U.S.C. § 9601(14) (defining "hazardous substance") (quoted above), states that "[hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph...." Specifically, defendant argues that its emulsion contains levels of metals designated as hazardous substances well below that found in virgin oil and, therefore, its "waste is clearly within the petroleum exclusion." Defendant's Memo of Law at 11. Disposing of this argument need not detain the court for long.

Suffice it to say that a plain reading of this "exclusionary" provision does not warrant inclusion of oil which has become contaminated with hazardous substances through use; rather, what does come within the ambit of the "petroleum exclusion"

is the oil or oil fraction which naturally contains the hazardous substance(s) unless the fraction itself is specifically listed or designated as a hazardous substance. This interpretation of the "petroleum exclusion" appears to be in line with the legislative history, scant as it is, which indicates that the "petroleum exclusion" is an exclusion from CERCLA for "oil spills" themselves and not for releases of oil which through use has become contaminated with (hazardous) substances not naturally found in oil. *See, e.g.,* S.Rep. No. 848, 96th Cong., 2d Sess. 30–31 (1980); 126 Cong.Rec. H11787, H11790, H11792, H11793, H11795, H11796, H11798 (daily ed. December 3, 1980); 126 Cong.Rec. S10578 (daily ed. August 1, 1980); *id.* at S10845 (daily ed. August 5, 1980); *id.* at S14963, S14967, S14974, S14980 (daily ed. November 24, 1980).

Lastly, defendant advances two constitutional challenges to imposition of liability: first, that the statute is void for vagueness because it does not adequately define "hazardous substance"; second, that the "selective" enforcement of CERCLA against it, the government choosing not to name other, allegedly more culpable entities—e.g., Cornell University—as defendants, violates the principle of equal protection of the laws.

 Neither challenge has merit. The void for vagueness challenge fails because, in the court's view, the statute and regulations do not fail to give a person of ordinary intelligence fair notice of what is required and forbidden. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *see also United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir.1990) (observing that a penal statute is not unconstitutionally vague if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."). Moreover, it has been observed that "[t]he degree of vagueness that the Constitution tolerates ... depend[s] in part on the nature of the enactment[,]" *Village of Hoffman Estates v.*

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), and that with respect to "regulatory statutes governing business activities, greater leeway is allowed," *Papachristou*, 405 U.S. at 165, 92 S.Ct. at 845. All the more is this so when matters of public health and safety are concerned. *See West Virginia Manufacturers Ass'n v. State of West Virginia*, 714 F.2d 308, 314 (4th Cir.1983). To withstand a void for vagueness challenge, it is sufficient if the meaning of the statutory or regulatory language is discoverable from its context. *See id.* In this regard, the court notes that a plain reading of the statutory and regulatory scheme reveals that a substance is hazardous if it has been listed, i.e., so designated, by the EPA pursuant to authority granted it by Congress.

█ As for defendant's other constitutional challenge, putting aside the broad discretion the government has regarding the exercise of its power to prosecute, *see Wayte v. United States*, 470 U.S. 598, 607–608, 105 S.Ct. 1524, 1530–1531, 84 L.Ed.2d 547 (1985), defendant has not established a *prima facie* case of selective enforcement. Simply stated, defendant has not shown that it has been singled out for civil prosecution for an improper purpose. *See University Club v. City of New York*, 655 F.Supp. 1323, 1328 (S.D.N.Y.1987), *aff'd on other grounds*, 842 F.2d 37 (2nd Cir.1988); *see also United States v. Garth*, 773 F.2d 1469, 1476 (5th Cir.), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 693 (1986); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974). The court notes, in passing, that Alcan was one of 83 named defendants.

In sum, the cadmium, chromium, copper, lead and zinc which defendant admits were in its emulsion are hazardous substances under CERCLA—regardless of the form in which these metals were present and notwithstanding the very low levels of concentration—by virtue of their designation as toxic pollutants under the Clean Water Act and their appearance on the Table 302.4 List of Hazardous Substances. In the court's view, the statutory language is clear, rendering resort to legislative history, which in any way comports with the court's understanding of the statutory scheme, *see* S.Rep. No. 848, 96th Cong., 2d Sess. 24–27 (1980) ("[S]ubstances listed as hazardous or toxic under certain other Federal laws are incorporated by reference and upon enactment of this bill such substances become statutorily defined as hazardous substances for the purposes of this bill. And the release of any of them or any constituent of them invokes the ... response provisions and any costs of removal or remedial action or any damages are subject to the liability provision of the bill."), entirely unnecessary, *see United States v. Monsanto*, 858 F.2d at 167 n. 10. Needless to say the court agrees with the overwhelming body of case law that has confronted the issue presented here.

Hazardous substances, released by defendant, were present at the PAS site, and the government responded by cleaning up the site, *see* Declaration of Raymond E. Lupe with RI/FS attached as exhibit (establishing a nexus between defendant's release of the hazardous substances at the PAS site and the government's response thereto); defendant has not established any of the limited statutory defenses and its constitutional challenges are without merit. Accordingly, plaintiffs are entitled to summary judgment as to defendants' liability. The court now turns its attention to the matter of recovery of response costs.

### B. Recovery of incurred costs

Under section 9607(a), Alcan is liable for "all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(4)(A); 40 C.F.R. §§ 300.1–300.71 (1989) (national contingency plan) (promulgated pursuant to 42 U.S.C. § 9605). The burden lies with the defendant to demonstrate that the costs incurred by the respective governments were inconsistent with the national contingency plan. *See United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726, 746 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *City of*

*Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1484, 1486 (E.D.Pa.1989). In the present case, plaintiffs seek to recover the difference between the stipulated amount of costs incurred through April 1, 1987 ($12,319,551.04) and the amount already recovered pursuant to the partial consent decree ($9,105,308.17) plus costs incurred since April 1, 1987 (some $710,635.17 by the United States and a net figure of $124,174 by the State of New York). Additionally, plaintiffs seek a declaration that Alcan is liable to both plaintiffs for future response costs associated with the PAS site and for prejudgment interest.

■ In view of the statutory provisions defining the terms "remove" and "removal," *see* 42 U.S.C. § 9601(23), "remedy" and "remedial action," *see id.* § 9601(24), "respond" and "response," *see id.* § 9601(25), remedial or removal action, for which the federal and state governments are entitled to recover from the party found liable, necessarily includes such activities as (a) investigations, monitoring and testing to identify the extent of danger to public health or welfare or the environment, (b) investigations, monitoring and testing to identify the extent of the release of hazardous substances, and (c) planning and implementation of a response action; also recoverable are "indirect" costs associated with the foregoing and with enforcement of the provisions of CERCLA, including administrative costs incurred by the staffs of the regulatory agencies involved and for the Department of Justice. *See United States v. Northeastern Pharmaceutical and Chemical Co.*, 579 F.Supp. 823, 850 (W.D. Mo.1984), *aff'd in part and rev'd in part on other grounds*, 810 F.2d 726 (8th Cir. 1986); *see also United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1501–1504 (6th Cir. 1989) (litigation and administrative costs recoverable including a proportionate share of indirect costs associated with cleanup operations), *cert. denied*, —— U.S. ——, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *State of New York v. Shore Realty Corp.*, 759 F.2d at 1043 (response costs include costs in assessing the conditions of the site); *United States v. Hardage*, 733 F.Supp. 1424, 1431–1432 (W.D.Okla.1989); *City of New*

*York v. Exxon Corp.*, 633 F.Supp. 609 (S.D. N.Y.1986) (recoverable costs include costs of collecting and analyzing ground water samples, hydrogeological studies and remediation study); *State of New York v. General Electric Co.*, 592 F.Supp. 291, 298 (N.D.N.Y.1984); *United States v. Wade*, 577 F.Supp. 1326, 1333 n. 4 (E.D.Pa.1983).

Defendant does not challenge the legality of any of the costs plaintiffs seek to recover; that is, defendant does not argue that the costs which plaintiff seeks to recover are not within the scope of the pertinent statutory provisions. And, ample documentation of the costs, direct and indirect, incurred by the EPA, the Department of Justice and the State of New York has been submitted to the court. Defendant's opposition to plaintiffs' summary judgment motion on incurred costs, aside from blanket denials to assertions of fact, is essentially three-fold: (1) plaintiffs have not demonstrated that any of the claimed costs were associated with metals contamination and it has not so stipulated; (2) discovery is needed for it to respond to the costs incurred since April 1, 1987; and (3) its liability is severable. None of these arguments has merit. The court will address the severability argument first.

Alcan rather summarily contends that it cannot be held jointly and severally liable because the harm caused by it is severable. In this regard, Alcan points out that whatever harm its hazardous substances may have caused would be limited to soil contamination, but, because the EPA's RI/FS appears to indicate that the concentration of metals in the soil was not high enough to warrant concern, "no remediation of soils was necessary [and] the harm from metal is clearly divisible." Alcan's Memo of Law at 29.

■ Only, brief comment is called for. First, defendant bears the burden of proof on the issue of severability, *see O'Neil*, 883 F.2d at 178–179; *United States v. Monsanto*, 858 F.2d at 171, and it has not demonstrated entitlement to judgment as a matter of law on this issue; second, the record amply demonstrates that the

harm inflicted at the site was indivisible because the contaminants found in the soil and the water were commingled, *see* Declaration of Raymond E. Lupe; Declaration of Eugene Meyer; and third, defendant has, in fact, confused divisibility of costs (irrelevant) with divisibility of environmental harm, *see, e.g., United States v. R.W. Meyer, Inc.*, 889 F.2d at 1507; *O'Neil*, 883 F.2d at 178–183; *United States v. Monsanto*, 858 F.2d at 171 n. 22. Congress, it bears noting, has acted to help ameliorate the potential harshness resulting from a determination that a defendant's liability is joint and several by enacting a right of action for contribution. *See* 42 U.S.C. § 9613(f) (Supp.1990); *see also United States v. Western Processing Co.*, 734 F.Supp. at 938.

Alcan's argument that plaintiffs have failed to demonstrate that any of the costs incurred were associated with metals contamination can be viewed as a challenge to the appropriateness of a portion of plaintiffs' response (i.e., that there was no contamination from metals), as a challenge to plaintiffs' response generally (i.e., that, if there was contamination from metals, plaintiffs have not itemized this expense), or as an argument that a nexus must be demonstrated between the response and an individual generator's contamination. However viewed, defendant's argument has no merit.

■ All that section 9607(a) requires is that there be a release or threatened release of a hazardous substance which causes the incurrence of response costs in order for a statutorily-defined generator of a hazardous substance to be held liable for all costs incurred so long as such costs are not inconsistent with the National Contigency Plan. 42 U.S.C. § 9607(a)(4)(A). As an initial matter, there is absolutely no requirement that a plaintiff demonstrate a causal nexus between a defendant's conduct and the contamination of the property involved. *See, e.g., Dedham Water Co.*, 889 F.2d at 1152–1154. What appears to be required, at most, is that the plaintiff demonstrate some relationship between the release and *a* response. In this regard, the

court notes that a release of hazardous substances occurred to which the government responded. Under the statute, then, the requisite nexus has been established. There is room, perhaps, to argue that a particular expenditure should not be included under the umbrella of "remedial action" because it is not sufficiently related to the release of the hazardous substances, but as noted defendant has not so challenged any of the claimed expenditures, and in any event the court is of the view that plaintiffs have amply demonstrated the relatedness of the direct and indirect expenditures of funds.

■ Additionally, defendant has not argued, much less demonstrated, that the plaintiffs' response to the presence of hazardous substance at the site was inconsistent with the national contingency plan, *see Northeastern Pharmaceutical and Chemical Co.*, 810 F.2d at 747, that is, that the governments' choices of response actions were arbitrary and capricious, *see id.* at 748. It is not open to the defendant to challenge the response undertaken by the government as "unreasonable". *See id.* at 748. There is no doubt that Alcan's emulsion brought to the PAS facility contained the metals subsequently found at the site. The contaminants were found in the soil and the water and were commingled. Moreover, it bears emphasizing that the government need not trace releases of hazardous substances to a particular defendant; it is sufficient if the site contains hazardous substances found in the defendant's wastes which were dumped at that site. *See City of New York v. Exxon Corporation*, 744 F.Supp. at 480 n. 10; *United States v. Western Processing Co.*, 734 F.Supp. at 936; *United States v. Marisol*, 725 F.Supp. 833, 840 (M.D.Pa.1989); *United States v. Wade*, 577 F.Supp. at 1333. Interestingly, defendant does not challenge the response to the groundwater contamination; nor does defendant argue that the surficial remedy did not clean up contaminants in the soil of the kind it contributed to the site. Its argument really is that the soil did not have to be cleaned up because the contaminants were not in a sufficiently high concentration to warrant the re-

sponse. The court's response to this last argument is two-fold: the United States or the State of New York should not have to wait until the problem becomes worse by the addition of other generators' hazardous substances; and the statute contemplates the recovery of costs associated with the clean-up of hazardous substances present in an area. Underlying defendant's argument, then, is the view that there was no contamination of the soil because concentration levels were low. The statute indicates otherwise.

The court notes that defendant has not offered any evidence to raise a genuine dispute of fact regarding the specific dollars amounts claimed. Also, as for a response to plaintiffs' incurred costs since April 1, 1987, defendant, as plaintiffs point out, has not demonstrated its entitlement to relief under Rule 56(f)—simply put, defendant has not explained what efforts were made at obtaining discovery and why those efforts were unsuccessful; moreover, discovery closed as of November 30, 1989; apparently, defendant never bothered with discovery regarding costs incurred after April 1, 1987.

Accordingly, defendant having failed to establish that the governments' response costs were inconsistent with the National Contingency Plan, all the incurred costs are conclusively presumed reasonable, *see Northeastern Pharmaceutical and Chemical Co.*, 810 F.2d at 748, and plaintiffs are thereby entitled to recover the difference between the stipulated amount of costs incurred through April 1, 1987 ($12,319,-551.04) and the amount already recovered pursuant to the partial consent decree ($9,105,308.17) plus costs incurred since April 1, 1987 (some $710,635.17 by the United States and a net figure of $124,174 by the State of New York).

Additionally, in recognition of the ongoing nature of response costs, pursuant to the authority granted the court under 42 U.S.C. § 9613(g)(2) (Supp.1990), the court enters a declaratory judgment in plaintiffs' favor that defendant is liable to plaintiffs for future response costs associated with the PAS site "which will be binding on any subsequent action or actions to recover further response costs". Both plaintiffs are also entitled to recover prejudgment interest under 42 U.S.C. § 9607(a) (Supp.1990) on the total response costs recovered by each of them. As requested by plaintiffs, they are granted leave to file declarations, within 20 days of the date of this memorandum-decision, setting forth the amount of such interest supported by the appropriate computations. Defendant will be allowed 10 days after such declarations are filed with the court to submit a response in opposition thereto if defendant feels the need to do so.

## C. Cornell University's liability

As a protective measure, to hopefully ameliorate the potentially harsh effects of a judgment against it, Alcan commenced a third-party action naming Cornell University as defendant. By this third-party action, Alcan seeks a declaration that Cornell is jointly and severally liable for the response costs incurred by the United States and the State of New York relative to the PAS site and an order directing Cornell to contribute its fair share. According to the third-party complaint, Cornell has contributed waste to the PAS site in the form of processed coal pile leachate which contains compounds composed of materials of the same character but of greater concentration than the waste contributed by Alcan. Cornell answered the third-party pleading, denying certain allegations and asserting eight affirmative defenses. Alcan has moved for summary judgment against Cornell on the basis that Cornell sent treated coal pile leachate containing certain amounts of chromium, copper and zinc to the PAS site. In response, Cornell has cross-moved for summary judgment dismissing the third-party complaint essentially on the ground that, because the EPA decided not to name it as a potentially responsible party in the main lawsuit, Cornell is not a party from whom Alcan may seek contribution.

In 1986, Congress enacted the Superfund Amendments and Reauthorization Act, legislation initially prompted by concern over the joint and several liability rule that had been judicially-grafted on to CERCLA.

*See O'Neil,* 883 F.2d at 179. Although Congress decided not to add a provision explicitly dealing with the matter of joint and several liability, *see United States v. Monsanto,* 858 F.2d at 171 n. 23, it did add two important provisions designed to mitigate the harshness of such liability. The first directs the EPA to offer early settlements to defendants who the agency believes are responsible for only a small portion of the harm, so-called *de minimus* settlements. *See O'Neil,* 883 F.2d at 179; 42 U.S.C. § 9622(g) (Supp.1990). The second creates a statutory cause of action for contribution, codifying what most courts had concluded was implicit in CERCLA as enacted in 1980. *See O'Neil,* 883 F.2d at 179 (noting in passing that, "[w]hile a right of contribution undoubtedly softens the blow where parties cannot prove that the harm is divisible, it is not a complete panacea since it frequently will be difficult for defendants to locate a sufficient number of additional solvent parties."); 42 U.S.C. § 9613(f) (Supp.1990).

In part, section 9613(f) provides as follows:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under ... section 9607(a) of this title.... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1). Alcan does not expressly state what equitable factors ought to be considered by the court; underlying its motion, however, is the argument that, since Cornell contributed metals to the PAS site which were the same as those contributed by it and which were identified by EPA and judicially determined by the court to be hazardous substances, fairness requires that Cornell shoulder some of the financial burden. For its part, Cornell admits that it "sen[t] treated coal pile run off to the PAS site," Attorney Thomas Mead Santoro's Affid. at ¶ 4, but that it should not be held jointly and severally liable because, by being removed from the list of potentially responsible parties (PRP) just before commencement of the main action, its liability has been resolved. (The court notes that initially Alcan had also been dropped from the list; Alcan was "placed back on the list apparently after the EPA discovered some documents that suggested that Alcan's emulsion was E.P. toxic." Alcan's Response to Cornell's Cross Motion at 4 n. 1.) Cornell asserts that "the last waste-in list prepared for PAS provided to Cornell before its removal from the list of PRP's by the EPA [in March 1986] discloses a volume which, if it had been considered hazardous by the EPA, would have made Cornell a *de minimus* contributor (i.e. less than 1%)." Attorney Thomas Mead Santoro's Affid. at ¶ 5. As support for its argument that it has resolved its liability with the EPA and, therefore, may not, or should not, be held liable for contribution, Cornell relies on 42 U.S.C. §§ 9613(f)(2) and 9622(g). A careful reading of these two sections reveals quite readily that Cornell's reliance on them is sorely misplaced.

Section 9613(f)(2) provides that [a] person who has resolved its liability to the United States ... in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

Section 9622(g), relating to *de minimus* settlements, provides in part as follows:

> (1) Whenever practicable and in the public interest, as determined by the President, the President shall as promptly as possible reach a final settlement with a potentially responsible party in an administrative or civil action under section ... 9607 of this title if such settlement involves only a minor portion of the response costs at the facility concerned and, in the judgment of the President, [certain other conditions are met][.]
>
> ....

(4) A settlement under this subsection shall be entered as a consent decree or embodied in an administrative order setting forth the terms of the settlement.

. . . .

(5) A party who has resolved its liability to the United States under this subsection shall not be liable for calims for contribution regarding matters addressed in the settlement.

42 U.S.C. § 9622(g)(1), (4), and (5) (Supp. 1990). Suffice it to say that no settlement was entered into at the administrative or judicial level between Cornell and the United States; Cornell was merely dropped as a potentially responsible party; in other words, the United States chose, for whatever reasons and in its discretion, not to pursue any legal action against Cornell. As such, Cornell's liability has not been resolved within the meaning of the foregoing statutes.

■■■ Cornell's cross motion, then, rises or falls based on the application of equitable factors deemed appropriate. Cornell's argument in this regard is tortured. First it argues that it would be unfair for the court to subject it to liability because it never had the opportunity to participate in the judicial settlement, having been "relieved" from responsibility prior thereto, but then argues that, because its responsibility has been determined to be less than that of certain *de minimus* parties, its liability can, at most, be less than that paid by the *de minimus* parties. Suffice it to say that Cornell's cross motion must be denied. In the court's view, there is no question that Alcan is entitled to summary judgment on its motion to the extent of declaring that Cornell University is liable for contribution. The amount for which Cornell is liable is, however, another matter. A hearing needs to be held to determine its fair share.

*Conclusion*

For the reasons stated above, plaintiffs' motions for summary judgment are granted in their entirety. In short, plaintiffs are entitled to recover from defendant the response costs sought by them, with prejudgment interest thereon to be calculated by plaintiffs and subject to review and acceptance by the court, and to a declaration that defendant is liable for future response costs. Defendant's motion for summary judgment seeking a declaration that third-party defendant Cornell University is jointly and severally liable for the response costs incurred by the governments relative to the PAS site is also granted; a hearing is necessary, however, to determine the extent of Cornell's fair share unless, of course, Alcan and Cornell resolve the matter themselves. The Clerk is directed to enter judgment accordingly which judgment shall thereafter be amended to include the appropriate interest.