Filed 10/6/22  Lyons Properties v. Simanian CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| LYONS PROPERTIES, LTD., <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> MITRA ELISHA SIMANIAN, D.D.S., INC., et al., <br><br>     Defendants and Appellants. | B299130 <br><br> (Los Angeles County <br>  Super. Ct. No. PC055195) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Melvin D. Sandvig, Judge.  Affirmed.

Sklar Kirsch, Lisa Skaist, Enrique A. Monagas and Ian S. Lansberg for Defendants and Appellants.

Goodkin Law Group, Gregory J. Maestri and Danial L. Goodkin for Plaintiff and Respondent.

———————————————

Appellants Mitra Elisha Simanian, a dentist (Simanian), and her professional corporation Mitra Elisha Simanian, D.D.S., Inc. (D.D.S., Inc.) (collectively Simanian) appeal from the judgment in favor of Lyons Properties, Ltd. (Lyons) after a bench trial. Dr. Simanian asserted that she was forced to vacate professional medical suites leased from Lyons because there was hazardous contamination on the property, and alleged claims for constructive eviction, fraudulent concealment, and violation of the disclosure requirement of Health and Safety Code section 25359.7.[1] On appeal, Simanian contends that the trial court erred in applying a de minimis exception to the statute's mandate requiring disclosure of "any" hazardous substance, regardless of the amount.[2]

We agree with Simanian that there is no de minimis exception to the notice requirement. The plain language of section 25359.7, subdivision (a) provides in relevant part: "Any owner of nonresidential real property who knows, or has reasonable cause to believe, that *any release of [a] hazardous substance* has come to be located on or beneath that real property shall, prior to the sale, lease, or rental of the real property by that owner, give *written notice of that condition* to the buyer, lessee, or renter of the real property." (Italics added.) This language is unambiguous: the owner's actual or imputed

---

[1]    All statutory references herein unless otherwise noted are to the Health and Safety Code. The operative causes of action pertinent to this appeal are the 24th (constructive eviction), 25th (fraudulent concealment) and 26th (violation of the disclosure requirements in § 25359.7, subd. (a)) of Simanian's third amended cross-complaint (environmental claims). All of the environmental claims were based upon the failure of disclosure under section 25359.7.

[2]    Simanian appealed separately from both the judgment and the award of attorney fees. On February 5, 2020, we consolidated those appeals.

("reasonable cause to believe") knowledge of any release (without qualification) of a hazardous substance located on or beneath the property, requires the owner to give notice of "that condition" to the buyer, lessee, or renter. However, although we agree with Simonian's interpretation of the statute, on the facts of this case Simanian cannot establish she was harmed by any failure to disclose and cannot prevail on the claims at issue in this appeal. We therefore affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This litigation initially began as a landlord-tenant dispute over common area charges and rent. During the course of the litigation, the landlord (Lyons) refinanced the property and obtained an environmental study revealing that the property had been previously contaminated with hazardous substances. The tenant (Simanian) then vacated the premises and added the environmental claims to the cross-complaint.

A. *The Property and Environmental Reports, 1988-2004*

Lyons owns a two-story medical building located at 23206 Lyons Avenue in Santa Clarita known as the Santa Clarita Medical Center. The site is approximately 1.5 acres and is improved with a 23-unit, 33,578 square foot, two-story commercial medical office building constructed in 1988. In 2004, Lyons purchased the building through an affiliated entity known as Atlas Investments, LLC (Atlas). Dana Goodman and Steven Goodman are the principals of Atlas and Lyons.

Before construction of the medical office building, the site had been used by AT&T as an office building and vehicle maintenance facility. There

was an underground storage tank (UST) and a septic system with several seepage pits.

As part of the Goodmans' purchase and financing, the lender required an environmental evaluation and commissioned an environmental report from SLA Environmental Services (SLA) dated September 24, 2004 (SLA Report). The SLA Report incorporated a previous study of the property done in 1988 prepared by Targhee, Inc. (1988 Targhee Report). The 1988 Targhee Report disclosed the prior uses of the property by AT&T and noted the presence of the UST and seepage pits.

In particular, the 1988 Targhee Report found BTEX (Benzene, Toluene, Ethylbenzene, and Xylene) 30 feet below ground level on the property.[3] The 1988 Targhee Report noted that the soil contamination with respect to Toluene, Xylene and Ethylbenzene required further study. The report stated that the former septic tank was not of environmental concern, nor were the trace amounts of BTEX compounds, which had attenuated to non-detectible levels. The report concluded, "[b]ased upon the review of previous and recently conducted subsurface activities, materials at the site are of minimal environmental concern and do not present a threat to groundwater."

According to Dana Goodman, the 1988 Targhee Report did not establish any health concerns; rather, Goodman understood that the property had been cleaned up, and that the levels of contaminants found in 1988 were of insignificant levels.

Nonetheless, the SLA Report recommended further environmental study of the property based upon the former UST. In October 2004, Lyons

---

[3]     These substances are considered "hazardous substances" under section 25316.

4

engaged Targhee to perform an updated Phase I environmental assessment (2004 Targhee Phase I Report).[4] The 2004 Targhee Phase I Report concluded that "[t]here is no evidence of current recognized environmental conditions in connection with the subject property." The 2004 Targhee Phase I Report noted that any hydrocarbon contamination from the UST was limited in size and there was no potential for groundwater contamination.

In November 2004, Targhee provided a Phase II report (2004 Targhee Phase II Report). Targhee noted that the UST site had been granted closure by Los Angeles County in August 1984. Borings taken at depths of from 10 to 35 feet did not disclose any detectible amounts of any gasoline products. In particular, there was no gasoline detected beneath the UST and any gasoline at the site had naturally attenuated to non-detectible levels. Any PCE (perchloroethylene) detected was not from the UST but likely from a neighboring dry cleaner, and it was not of environmental concern. Targhee also found the former septic tank and seepage pits also were not of environmental concern.

---

[4] A Phase I assessment is intended to identify recognized environmental conditions (REC) on property. A Phase II assessment is conducted where a Phase I report recommends further study and generally involves site testing for contaminants.

As explained in the 1988 Targhee Report, RECs are defined as "the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum products into structures on the property or into the ground, groundwater, or surface water of the property. . . . The term is not intended to include *de minimis* conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be subject of an enforcement action if brought to the attention of appropriate governmental agencies. Conditions determined to be *de minimis* are not *recognized environmental conditions*."

5

In 2004, the lender required Lyons to execute environmental indemnities to secure the loan.

B.    *Simanian's 2006-2008 Leases of Suites 203, 204  and 212*

In early 2006, Dr. Simanian purchased the practice of another dentist who was a tenant in the building (the practice was known as Massen Management).  In connection, D.D.S., Inc. received an assignment of Massen Management's lease for suites 203 and 204, which lease was set to expire in December 2008.

In October 2006, D.D.S., Inc. entered into an eight-year lease for suite 212 at the property.  Pursuant to an amendment to that lease, rent was set to commence in September 2007.

Dr. Simanian's husband is a real estate broker who manages her properties.  Paragraph 1.2 of the suite 212 lease states, "Tenant acknowledges that Tenant has inspected the Premises and is . . . not [relying] on any statement made by Landlord . . . regarding the physical condition of the Premises."

An amendment to the suite 212 lease provided that it was "recommended that [Simanian] consult with a professional . . . in evaluating the condition of the property, including the possible presence of . . . hazardous materials and underground storage tanks."  Simanian admitted she did not investigate the environmental condition of the property.

In June 2008, in order to extend her tenancy at the property, Lyons and D.D.S., Inc. entered into a lease with a term of five years for suites 203 and 204.  This lease ended in July 2013.

6

Dr. Simanian was the guarantor of the leases. At the time of D.D.S., Inc.'s leases, Dr. Simanian claimed Lyons made no mention of the previous environmental reports on the property.

### C. *Lyons' 2013 Breach of Lease Action*

In February 2012, Dr. Simanian asked for a reduction in rent because of financial difficulties, asserting that her dental practice had not recovered from the 2008 recession. Dr. Simanian stopped paying rent and, due to illness and economic hardship, surrendered suites 203 and 204 in July 2013.

Around this time Dr. Simanian and her husband purchased another commercial building adjacent to the property and hired contractors to build out the space in June 2014, before they learned of any contamination at the property. They told the contractors they were in a hurry to move into the new property so they could avoid paying rent at the old property.

Dr. Simanian testified that she had operated five dental practices throughout the Los Angeles area.

In September 2013, Lyons sued Simanian for breach of lease, seeking amounts due under the leases. On February 19, 2014, before they learned of any environmental studies, Simanian cross-complained for conversion, breach of contract, fraud, and related claims based upon Lyons' asserted improper tenant charges, including late fees and interest. In June 2014, Simanian filed an amended cross-complaint alleging claims relating to the security deposit, miscalculation of the common area charges and maintenance. None of these initial pleadings raised the issue of environmental contamination.

7

D.    *2014 Lyons Refinance of the Property*

In December 2014, Lyons initiated a refinance of the loan.  Lyons informed the tenants that it would be conducting an environmental assessment at the property and identified the environmental consultant.

AEI Consultants prepared a Phase I environmental report.  AEI noted the presence of environmental conditions on the property and recommended investigation in the areas of the former septic system.  Lyons retained AEI to perform a Phase II study.

The 2014 Phase II study disclosed the presence of 13 parts per billion of PCE in soil 35 feet below the surface but did not detect any BTEX.  The report noted that any vapor intrusion risk into the building "was not present at the site for the current site use."  The report did not recommend any further action.  Testimony at trial established that 13 parts per billion was analogous to 13 seconds of exposure over a 32-year period, or to one drop of water in 10 Olympic-size swimming pools.  Further, regulations provide that a chemical present in soil at a depth greater than 10 feet does not present "a direct pathway" to expose persons.

AEI also observed that in 1984 the County of Los Angeles had granted closure status to the UST on the site, concluding the threat of water contamination was minimal.

E.    *Simanian's 2014 Investigation*

On November 18, 2014, Dr. Simanian received notice of the environmental study.[5]  Testing was to take place in the area near suite 212 and Dr. Simanian's parking space.  Simanian received a site map showing

---

[5]    At trial, she testified she received notice on December 8, 2014.

8

the former AT&T motor vehicle shop and depicting the UST and seepage pits. Until receipt of the report, Simanian had no knowledge of the property's environmental issues. Dr. Simanian, who has health issues, became concerned about the conditions at the property.

Although Simanian attempted to obtain information about the testing, she claimed she was rebuffed. As a result, Dr. Simanian conducted her own investigation. In preparing her investigation, she obtained the 1988 Targhee report, the 2004 SLA report, the 2004 Targhee Phase II report, and the 2014 AEI Phase II assessment.

Dr. Simanian conducted air testing in suite 212 in late 2014. Her report did not disclose any chemicals. On the other hand, Lyons' expert opined that the chemicals detected in the air sampling report (Acetone, Isopropyl Alcohol and Toluene) are commonly found in dental practices.

F.     *Simanian Rescinds the 2012 Lease and Vacates the Property*

In January 2014, Dr. Simanian vacated the property for the safety of her staff and patients. Simanian filed a second amended cross-complaint, alleging constructive eviction, fraudulent concealment, and violations of section 25359.7.

In spite of her concerns with the Lyons property, Dr. Simanian admitted she did not test her new property for environmental contamination, although it was located near a known automotive shop as well as dry cleaners. Simanian did not obtain an environmental report on the new property.

On February 17, 2015, Simanian filed the operative third amended cross-complaint (TACC). Three of the claims (constructive eviction,

9

fraudulent concealment, and violation of § 25359.7) were the subject of the Phase I bench trial.

G.    *Stipulation and Election of Remedies.*

Before commencement of the bench trial in February 2018, Simanian stipulated to limit her remedies to rescission and restitution.

H.    *Evidence at Bench Trial*

The Phase I bench trial on the environmental claims commenced February 26, 2018. At issue were the constructive eviction, fraudulent concealment, and violation of the disclosure requirements in section 25359.7, subdivision (a) causes of action.

Simanian's toxicology expert, Dr. David Benjamin, had recommended that she vacate suite 212 because the chemicals found in the soil samples were highly toxic and any exposure placed an individual at risk. Simanian's real estate expert opined that Lyons' failure to disclose the environmental contamination was a deviation from the standard of care under section 25359.7.

The 2014 environmental report stated that "based on the lack of documented release depth to groundwater and gradient, review of regulatory files was not deemed necessary, and therefore, this site is not expected to represent a significant environmental concern." Dr. Benjamin admitted that contaminants near the removed UST were "naturally attenuated" or were so limited that they did not represent a "significant risk to human health."

Stephen Donell testified as a real estate expert that the custom and practice in the real estate industry is to follow recommendations in environmental reports.

10

Shayan Simantob, the AEI consultant who conducted the 2014 environmental evaluations, defined "hazardous substance" as chemicals at certain concentrations which would meet the definition of either state or federal "hazardous waste." As of November 2014, no further action was recommended at the property due to lack of soil contamination and low levels in soil vapor. Soil samples did not show detectible levels.

Neighboring drycleaner Ruth Chavez had been using PCE at her business since 1999. She followed all environmental guidelines.

Nancy Beresky testified for Lyons as an environmental expert that recognized environmental conditions (REC) are those conditions that pose a material threat of future release; de minimis conditions are not RECs. A hazardous substance must have a "pathway" into the body in order to harm a person's health. The likelihood of toxic vapors making their way through the concrete slab of the building was remote.

Environmental studies generally require (1) identification of the substance, (2) health effects at different level of exposure, (3) assessment of potential pathways, and (4) risk characterization, arrived at by combining the first three factors. As at the property, contamination of the soil at a depth greater than 10 feet has no direct pathway for exposure. The level of PCE in the soil at the property was 6.78 mg per cubic meter, below the maximum commercial level of 20.8 mg per meter.

The chemicals found in Simanian's air sampling report (Acetone, Isopropyl Alcohol and Toluene) were commonly found in dental offices.

I.      *Trial Court Statement of Decision*

The trial court issued its statement of decision on May 23, 2018. The court held the de minimis level of soil contamination at the property did not

11

support Simanian's environmental claims, citing *Commerce Redevelopment Agency v. American Home Products* (C.D. Cal. 1993) 1993 WL 13005326 (*Commerce Redevelopment*). The court noted that the amounts of chemicals present were so low they did not represent a health hazard and therefore did not trigger any disclosure duty, and any non-disclosure was not willful. As a result, Simanian could not establish that there was a duty to disclose, fraudulent concealment, or constructive eviction.

### J. *Stipulation for Entry of Judgment*

Following the statement of decision, numerous claims from the second amended complaint and third amended cross-complaint remained. In order to avoid the continued costs of litigation associated with Phase II of the trial and to facilitate Simanian's right to appeal the Phase I decision, on April 17, 2019, Lyons and Simanian entered into a stipulation for entry of judgment on Lyons' claims and judgment in favor of Lyons on the Phase I environmental claims in Simanian's cross-action.

The parties also stipulated to dismissal with prejudice of Simanian's other claims, some of which were previously dismissed by Simanian without prejudice on August 10, 2018, as follows: (1) entry of judgment against Simanian on Lyons' claim for unpaid rent in the amount of $145,127.93; (2) entry of judgment in favor of Lyons on the environmental claims pursuant to the trial court's May 23, 2018 statement of decision; and (3) dismissal of the common area claims (first, fifth through 20th, 22nd and 23rd causes of action of the third amended cross-complaint) as well as the second, third, fourth, and 21st causes of action, which had been previously dismissed without prejudice on Aug. 10, 2018), thus disposing of all causes of action in the TACC with prejudice.

12

K.   *Attorney Fees*

After judgment was entered, Lyons filed a motion for attorney fees and costs, seeking $835,320.95 in fees and $55,805.78 in costs on the $147,127.93 judgment.  The trial court reduced the fees and costs, awarding $606,195 and $29,025.42, respectively.

## DISCUSSION

Simanian argues that the trial court improperly interpreted section 25359.7 to add a de minimis exception to the requirement that the owner of real property give notice of any release of a hazardous substance that is located on or under the property.  Relying on *United States v. Alcan Aluminum Corp.* (N.D.N.Y. 1991) 755 F.Supp. 531 (*Alcan*) and *City of New York v. Exxon Corp.* (S.D.N.Y. 1990) 744 F.Supp. 474 (*Exxon*), she asserts that the statute's plain language creates a bright-line rule requiring disclosure of *any* hazardous substance with no quantitative requirement.  Given that hazardous substances were detected at the property (she points to the 12,000 gallon UST and the 1988 and 2004 reports detailing the existence of PCE and BTEX at the property), Simanian argues that disclosure was mandatory.  If the judgment is reversed, she also asks that we reverse the award of the attorney fees.

I.   *Standard of Review and Principles of Statutory Construction*

Statutory construction is a question of law which requires the exercise of our independent judgment.  In interpreting a statute, our task is to discern the Legislature's intent.  The statutory language itself is the most reliable indicator of such intent, and we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context.  If

13

the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 378.)

On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. If faced with ambiguity, we may also consider the consequences of a particular interpretation, including its impact on public policy. If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. (*DeNike v. Mathew Enterprise, Inc., supra,* 76 Cal.App.5th at p. 378.)

With respect to findings of fact, we review those a under the substantial evidence standard. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935, 74 Cal.Rptr.3d 436.) We infer any factual findings necessary to support the judgment unless a party filed objections. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494.)

II.   *Although Section 25359.7 Mandates Disclosure of Trace or Insignificant Amounts of Hazardous Substances, Simanian Failed to Show She Was Harmed by Lyons' Failure to Disclose*

The Carpenter–Presley–Tanner Hazardous Substance Account Act (HSSA), section 25300, et seq., is California's version of CERCLA, the federal

14

"superfund" statute.[6] CERCLA "was designed to promote the "'timely cleanup of hazardous waste sites'" and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." (*Burlington Northern and Santa Fe Ry. Co. v. United States* (2009) 556 U.S. 599, 602.) Under a sunset provision in 1999, the HSAA became inoperative; however, in 1999, the HSAA was reenacted with no sunset date. (Stats. 1999, ch. 23, §§ 2, 3; *City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 345, fn. 4.) The HSAA utilizes CERCLA definitions except where the HSAA defines them or "the context requires otherwise." (§ 25310; *Otay Land Co., LLC v. U.E. Ltd., L.P.* (2017) 15 Cal.App.5th 806, 822.)

HSAA's purposes include providing for "response authority" for releases of hazardous substances that pose a threat to the public health or environment. (*City of Lodi v. Randtron, supra,* 118 Cal.App.4th at p. 351.) Section 25301 specifically defines the purpose of the HSAA: (1) to "[e]stablish a program to provide for response authority for releases of hazardous substances, including spills and hazardous waste disposal sites that pose a threat to the public health or the environment"; and (2) to "[c]ompensate persons, under certain circumstances, for out-of-pocket medical expenses and lost wages or business income resulting from injuries proximately caused by exposure to releases of hazardous substances." (§ 25301, subds. (a) & (b).)

The HSAA definition of "hazardous substance" is similar to the CERCLA definition.[7] (§ 25316.) Section 25359.7, subdivision (a) provides:

---

[6]     CERCLA is the Comprehensive Environmental Response, Compensation and Liability Act. (42 U.S.C. §§ 9601, et seq.)

[7]     Section 25316 provides in relevant part that a "hazardous substance" is "(a) Any substance designated pursuant to Section 1321 (b)(2)(A) of Title 33 of the United States Code. [¶] (b) Any element, compound, mixture,

15

"Any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substance has come to be located on or beneath that real property shall, prior to the sale, lease, or rental of the real property by that owner, give written notice of that condition to the buyer, lessee, or renter of the real property. Failure of the owner to provide written notice when required by this subdivision to the buyer, lessee, or renter shall subject the owner to actual damages and any other remedies provided by law. In addition, where the owner has actual knowledge of the presence of any release of a material amount of a hazardous substance and knowingly and willfully fails to provide written notice to the buyer, lessee, or renter, as required by this subdivision, the owner is liable for a civil penalty not to exceed five thousand dollars ($5,000) for each separate violation." The parties here do not dispute that the substances on the property were "hazardous" within the meaning of section 25316.

## A. *Violation of Section 25359.7*

In the instant case, the trial court relied on *Commerce Redevelopment, supra,* 1993 WL 13005326, a decision of the United States District Court for the Central District of California.[8] In that decision, the court described the

---

solution, or substance designated pursuant to Section 102 of the federal act (42 U.S.C. Sec. 9602). [¶] (c) Any hazardous waste having the characteristics identified under or listed pursuant to Section 6921 of Title 42 of the United States Code, but not including any waste the regulation of which under the Solid Waste Disposal Act (42 U.S.C. Sec. 6901 et seq.) has been suspended by act of Congress."

[8] Opinions from other jurisdictions—some of which have different publication criteria than California—can be cited without regard to their publication status and may be regarded as persuasive. (*Central Laborers'*

16

notice requirement of section 25359, subdivision (a) as follows: "[U]nder the Notice Statute, if a hazardous substance is present on or beneath property at the time of sale, and if the seller of the property knows or has reason to know of that condition, notice of the condition must be given to the buyer. The statute does not require notice of every incident in which a hazardous substance was spilled. For long-lived industrial properties such as this one, such a requirement would be burdensome and unnecessary. The statute requires notice only of the present 'condition' of the property, not a detailed recitation of the history of every spill." (*Id*. at p. *15.)

We disagree with *Commerce Redevelopment's* analysis, as it misread the unambiguous language of the statute. The first sentence of section 25359.7, subdivision (a) provides: "Any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substance has come to be located on or beneath that real property shall, prior to the sale, lease, or rental of the real property by that owner, give written notice of that condition to the buyer, lessee, or renter of the real property." There is no ambiguity in this language: the owner's actual or imputed ("reasonable cause to believe") knowledge of *any* release of a hazardous substance located on or beneath the property, requires the owner to give notice of "that condition" to the buyer, lessee, or renter. Further, under the second sentence of section 25359.7, subdivision (a), the "[f]ailure of the owner to provide written notice when required by this subdivision to the buyer,

---

*Pension Fund v. McAfee, Inc*. (2017) 17 Cal.App.5th 292, 319, fn. 9.) In that regard, unpublished federal opinions are citable as persuasive, although not precedential, authority. (*Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1352, fn. 6.)

17

lessee, or renter shall subject the owner to actual damages and any other remedies provided by law."

The third sentence of the subdivision is also significant for our analysis. It states: "In addition, where the owner has actual knowledge of the presence of any release *of a material amount* of a hazardous substance and knowingly and willfully fails to provide written notice to the buyer, lessee, or renter, as required by this subdivision, the owner is liable for a civil penalty not to exceed five thousand dollars ($5,000) for each separate violation." (Italics added.) In other words, if the failure to give the notice required of "any release of hazardous substance" rises to the level of a knowing and willful failure to give notice "of any release of a material amount of a hazardous substance," the owner is subject to civil penalties in addition to actual damages and other remedies provided by law. In short, whether the hazardous substance on or below the property is in a material amount is relevant to the possible imposition of civil penalties, but not to the existence of the duty to disclose itself. That duty exists for any release of a hazardous substance, material or not, if the owner knows or has reason to know of that condition.

Our conclusion is consistent with cases interpreting CERCLA's notice requirements. As set forth in *Alcan, supra,* 755 F.Supp. 531 and *Exxon, supra,* 744 F.Supp. 474, the presence of any hazardous substance, no matter how small the amount, mandates disclosure. *Exxon* and *Alcan* are opinions issued on pretrial motions in the same CERCLA cleanup dispute. The State of New York sought to recover clean-up costs from multiple entities, and one of the entities, Alcan, asserted that the amount of substances it discharged was less than background levels and, therefore, did not constitute hazardous substances under CERCLA. (*Exxon, supra,* 744 F.Supp. at p. 483; *Alcan,*

18

*supra,* 755 F.Supp. at p. 536.) Both cases rejected this assertion. In *Alcan,* the court observed that "Alcan seeks to have this court read into the statutory and regulatory scheme (1) a requirement that in order for the listed substances to be deemed 'hazardous' these substances must be present in a certain amount or concentration and (2) a requirement that the listed substance be present in a 'harmful' form[;] after all, defendant argues, several of these substances and many listed by the EPA occur naturally and are even essential to the continued existence of life." (*Id.* at p. 536.) *Alcan* rejected the argument, stating the "'statutory language fails to impose any quantitative requirement on the term hazardous substance.'" (*Id.* at p. 537; see also *Exxon, supra,* 744 F.Supp. at p. 490 [hazardous substances need not be present in any particular concentration to be considered hazardous under CERCLA].)

For the foregoing reasons, we conclude that Lyons was under a duty to disclose the presence of "any" hazardous substances present or under the property about which it knew or had reasonable cause to know. But our inquiry does not end there, because Simanian has failed to show entitlement to any remedy under the statute. The evidence fails to show that Simanian suffered any actual damage. There was no evidence in any of the environmental reports or any testimony at trial that the substances found were health hazards or needed further remediation. Simanian's own study did not show any of the hazardous substances found in the soil had migrated to her dental office. Simanian points to no evidence otherwise and does not dispute that the substances posed no threat to health because they were in such small amounts or had no pathway to contaminate the air or surface soil. For the same reason, Simanian is also not entitled to any civil penalties for the failure to disclose a *material* amount of hazardous substances.

19

B.   *No Constructive Eviction*

The tort of constructive eviction derives from the covenant of quiet enjoyment implied in every lease.  (*Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 291.)  The covenant insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy.  (*Id.* at pp. 291–292.)  Thus, "'any disturbance of the tenant's possession by the lessor or at his procurement . . . which has the effect of depriving the tenant of the beneficial enjoyment of the premises, amounts to a constructive eviction, provided the tenant vacates the premises within a reasonable time.'"  (*Id.* at p. 292.)  Determining whether there has been a breach of the covenant of quiet possession generally depends upon the facts in each case.  (*Id.* at p. 293.)  Here, Simanian's theory of constructive eviction is that the mere presence of hazardous substances on the property made the premises uninhabitable for purposes of a dental office.  However, Simanian admitted that she did not conduct an investigation as suggested by the leases before moving into the property, and she initiated a move of her office to nearby building well before learning of the contamination.  Furthermore, her own testing failed to disclose any contaminants in her office.  Hence, her claim for constructive eviction fails because she cannot establish the chemicals present in the soil at the property in any way interfered with her enjoyment of the property.

C.   *No Fraudulent Concealment*

Simonian seeks rescission of her leases based on fraudulent concealment.  (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1384–1385.)  Fraudulent concealment requires a showing that, with the intent to defraud,

20

the defendant concealed a material fact that the defendant had a duty to disclose; that the plaintiff was unaware of the fact; and that the plaintiff would not have acted as it did had it known the fact. (*Butler America, LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal.App.5th 136, 144.) Here, substantial evidence supports a finding that there was no intent to defraud. Dana Goodman testified that she did not disclose the presence of hazardous substances because she believed the contamination on the property had been cleaned up and there was no health danger.[9]

Moreover, there is substantial evidence that the failure to disclose was not material in Simonian's decisions with respect to the property. As noted, Simanian did not conduct an investigation of the possible presence of hazardous substances as suggested by the leases before moving in. Moreover, the presence of hazardous substances was insignificant to the habitability of the property, as it presented no health danger. Further, Simonian initiated the move of her office to a nearby building as the result of a rent dispute, well before learning of the presence of the hazardous substances. This evidence supports a finding that the failure to disclose the insignificant presence of hazardous substances was not a material omission and did not affect the decisions Simonian made with respect to leasing and vacating the property.

D.    *Attorney Fees*

Simanian has made no argument that the amount of the attorney fees award was unsupported. She bases her challenge to the attorney fees solely on her contention that judgment on the merits of her claims must be

---

[9]    We need not discuss Lyons' argument that there was no "release" under section 25301, subdivision (a).

21

reversed.  Because we affirm the trial court's judgment on the merits, we also affirm the award of attorney fees.

## DISPOSITION

The judgment and order awarding attorney fees are affirmed. Respondents shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


CURREY, J.